STATE OF NEBRASKA, EX. REL. J. W. PEARMAN, v. F. W. LIEDTKE, AUDITOR OF PUBLIC ACCOUNTS.

1. **Constitutional law:** PRINTING OF AMENDMENTS TO BILLS. *Held*, That the language of section 11 of Article 3 of the constitution: "Every bill and concurrent resolution shall be read at large on three different days in each house, and the bills and all amendments thereto shall be printed before the vote is taken upon its final passage," does not apply to amendments attached to a bill upon the report of a committee of conference after a disagreeing vote of the two houses.

2. **Act to take effect upon the happening of a future and uncertain event.** "The event or change of circumstances on which a law may be made to take effect must be such as, in the judgment of the legislature, affects the question of the expedi-

ency of the law; an event on which the expediency of the law, in the opinion of the law-makers, depends. On this question of expediency the legislature must exercise its own judgment definitely and finally. When a law is made to take effect upon the happening of such an event the legislature in effect declares the law inexpedient if the event should not happen, but expedient if it should happen." Ruggles, C. J., in *Barto v. Himrod*, 8 N. Y., 489.

ORIGINAL application for mandamus.

*Covell & Ransom* and *J. C. Watson*, for relator.

*The Attorney General*, for the respondent.

COBB, J.

The act under which the relator claims is entitled "An act making appropriations for the payment of miscellaneous items of indebtedness owing by the state of Nebraska," and was approved February 27, 1879. (Laws 1879, p. 429.) It contains ninety-two distinct appropriations, to as many separate persons and firms, for as many different causes of indebtedness on the part of the state, divided under seven heads—penitentiary, capitol building, blind asylum, insane asylum, stationery, sheriffs' fees, and miscellaneous. The relator's claim is the eighty-seventh item, and is in the following words:

"16. J. W. Pearman, for military services, $3,000. [That said $3,000 remain in the treasury of the state, and not to be paid or drawn out until the general government shall re-imburse the said amount to this state.]"

The constitution of the state contains the following provision: "SEC. 11. Every bill and concurrent resolution shall be read at large on three different days in each house, and the bill and all amendments thereto shall be printed before the vote is taken on the final

The State v. Liedtke.

passage." *    *    *    *    *    *    *    *
Sec. 11, Art. III., Const.

The relator states in his affidavit accompanying his motion for a writ of mandamus that the "said clause [the clause in brackets above] is unconstitutional and void because it is and was an amendment to the original bill proposed on the last night of the session of the said legislature of the state of Nebraska, at which said act was passed, which said amendment was not printed before the vote was taken on the final passage of the bill," etc. This allegation is not denied by the respondent, and for that reason the relator claims judgment upon the pleadings.

Ordinarily, where a material fact is alleged in a petition, or paper which stands in the place of a petition, and is not denied by the defendant in his answer, such fact will be taken and considered as true, the same as though proved by the amplest evidence. But this question is not within the ordinary rule. This is not an allegation of fact involving the merits of the plaintiff's claim to be paid $3,000 by the state. It is an allegation that a certain clause of the statute, approved by the executive and published by the state for the guidance and government of the courts as well as of all the people of the state, is or is not the law of the land. It therefore becomes the duty of the court to avail itself of all the means within its reach to ascertain the truth or falsity of such allegation—a duty which it cannot shirk because of the failure of the respondent to deny the truth of such allegation.

Upon a thorough examination of the journals of the two houses for the last session, I find that it is probably true that the clause in question was not printed. But I also come to the conclusion that the letter of the constitution did not require that it should be printed. And while such requirement is probably

within the spirit of the constitutional provision referred to, I have met with no authority which has gone so far as to reject a provision of a statute because of its conflict with the spirit only of a constitutional provision.

The act in question originated in the house, and constituted house roll 190, said bill having been reported to the house from the committee of claims on the 15th day of February, 1879, was read on two different days, considered in committee of the whole, amended, engrossed for a third reading, read a third time (on a day different from that of its first or second reading), and on the 20th of February the said bill was declared by the speaker to have been read at large on three different days, and the same, with all its amendments, having been printed, whereupon it was put upon its passage by yeas and nays, and having received a constitutional majority was declared passed. This bill, as it passed the house, contained no appropriation to the relator. It went to the senate on the same day of its passage by the house, and on the following day received its first reading in that body; its second reading on the 22d of February. On the 24th the bill was amended in the senate and referred to the committee of claims, with instructions. On the same day it was reported to the senate from the said committee, with sundry amendments, among which is the item of $3,000 to the relator for military services, but without the other words constituting the said clause as it now stands. On the same day the bill, with the amendments reported from the committee of claims, was considered in committee of the whole, and upon the report of the committee of the whole was adopted by the senate. On the 25th the bill was read the third time, whereupon the president of the senate declared that the said bill had been read at large on three dif-

ferent days, and the same, with all its amendments, having been printed, he put the same upon its passage, and the bill passed the senate by a constitutional majority.

It will thus be seen that the constitutional provision requiring the bill and all amendments thereto to be "printed before the vote is taken upon its final passage," had spent its entire force upon the bill in question before the clause limiting or qualifying the appropriation to the relator had been proposed. The words "final passage" as applied to matters of legislation were well known to the framers of the constitution, and presumably so to the people who adopted it. And it is a part of the legislative and political history of the country that a large per cent of the most important legislation of the states, as well as of the national government, consists of measures proposed as amendments to bills by committees of conference after such bills have gone through all the stages of legislation in the two houses, and only lack concurrence, often on trivial and unimportant points. The object of the constitutional provision is to ensure more deliberate action and prevent haste in the maturing and passage of bills. This is a commendable object and one which should be upheld so far as possible by a sound construction of the constitution. Yet there is a time within the existence of all legislative bodies when haste is absolutely necessary, and when much deliberation is quite out of the question. All of this was well known to the framers of the constitution, and hence the section under consideration does not require the printing of amendments after the bill has been put upon its final passage. Any other line of construction, if followed in its necessary sequence, would lead to a condition of repeated printings and readings on different days, which would tend to becloud rather than to enlighten the legislator,

and would render it impossible to perform the necessary legislation within the forty days to which another section of the constitution limits each session of the legislature.

But to continue the history of this bill.    It was on the 25th returned to the house with sundry amendments, among others the appropriation to the relator. On the same day it was taken up and some of the amendments concurred in and some non concurred in. Among the latter we find the appropriation now under consideration.    So the bill went back to the senate, which body refused to recede from their amendments and asked a committee of conference.    On the same day a like committee was appointed on the part of the house, and the committee of conference made its report to the two houses respectively with sundry recommendations, among the rest " add to line 9" (that being the line containing the appropriation to the relator now under consideration) that the said " $3000 remain in the treasury of the state and not be paid nor drawn out until the general government shall re-imburse the said amount to this state."    The report was adopted by each house respectively.    The adoption of this report was the final legislative act upon this bill so far as either house was concerned. There are other steps pointed out to be pursued upon the contingency of the bill being returned by the governor to the house in which it originated, with his objections thereto.    As we have already seen, there being no constitutional provision requiring the printing of an amendment to a bill made in the manner above detailed, we must regard all parts of this bill, so far as the appropriation to the relator is concerned, as of equal authority, and we must therefore examine the language of the clause and see if we can ascertain the intention of the legislature therein sought to be expressed.

In this examination we shall derive but little aid from the authorities.  It is seldom that we meet with language of this character in an act without something to indicate whether the framers desired it to be understood as a saving clause or as a proviso, while it must have been intended for one or the other.  If such were not the case, and the court were disposed to consider this case upon purely technical grounds, we would probably be spared considerable labor, for it is laid down in some of the earliest reported cases that a saving clause which is totally repugnant and subversive of the purview of a statute will be rejected, yet that a proviso  equally repugnant and subversive will be allowed to stand, and the purview must give way. While I confess that I fail to see the reason for this distinction, it is backed by most respectable authority. But we cannot follow it because of the failure of the legislature to label this clause either as a saving clause or a proviso, and in substance it is as much the one as the other.

The reason given in the case of the *Attorney General v. The Governor and Company of the Chelsea Water-Works,* Fitzgibbon, 195, why, where in an act of parliament the proviso was directly repugnant to the purview, the proviso should stand and the purview give way, is because the proviso speaks the last intention of the law-giver.  It was compared to a will— says the report—in which the latter part, if inconsistent with the former, supersedes and revokes it. Were we at liberty, while discussing this branch of the question to consider the history of this measure in its passage through the several stages of legislation, we would see that the above reason applies to it with considerable force.  One branch of the legislature expressly refused its assent to the appropriation without the restricting and qualifying clause, which was after-

wards attached, for the purpose of securing for it a consideration which otherwise was denied it.

But the proviso or saving clause—whichever it may be called—now under consideration, may not be entirely subversive of the purview of the act. Possibly some effect may be given the section with that clause attached. If so, then, upon the true principles of construction, which require that, when possible, some effect shall be given to each word and sentence of a statute, it should be given such construction as upon a fair consideration of all its parts seems to express the intention of the legislature in adopting it. It was evidently the intention of the legislature to pass affirmatively upon the justice of the relator's claim against the state to the amount of $3,000, and to provide that, upon the happening of a certain future event, the relator should be paid that amount out of the state treasury without being put to the trouble, delay, or expense of another application to the legislature. That event is the allowance by the general government of the United States, and the appropriation by congress of money to pay for the services of the relator, either specifically or generally, as one of a class of claims growing out of the Indian service, long pending before congress. It was competent for the legislature to pass an act depending for its execution, either in whole or in part, upon the happening of such a contingency, and such an act is not to be confounded with those acts of legislation which have generally been held void by reason of their being made to depend for their vitality upon their ratification by the voters at a popular election.

In the opinion of the court in *Barto v. Himrod*, 8 N. Y., 490, Chief Justice Ruggles says: "The event or change of circumstances on which a law may be made to take effect must be such as, in the

judgment of the legislature, affects the question of the expediency of the law, an event on which the expediency of the law, in the opinion of the law-makers, depends. On this question of expediency the legislature must exercise its own judgment definitely and finally. Where a law is made to take effect upon the happening of such an event the legislature in effect declares the law inexpedient if the event should not happen, but expedient if it should happen," etc. This case is followed in *Ex parte Wall*, 48 Cal., 279–313, and is quoted with approval by Cooley. Cooley's Constitutional Limitations, 146. See also *The Cargo of the Brig Aurora v. United States*, 7 Cranch., 382, which treats of one of a numerous class of cases where the legislation of congress is made to depend for the occasion of its execution upon the happening of future and uncertain events affecting the expediency of such measures.

The relator, in his brief, also makes the point that "said clause is void and unconstitutional for the following reasons: (1.) Said bill contains more than one subject, and does not clearly express the same in the title." While the writer might be inclined to agree with him in that conclusion, yet I do not see how that can help the relator. If the act is unconstitutional and void, certainly this court cannot be required to enforce any of its provisions by mandamus. But without passing upon this point we have already seen that the rights of the relator under the said act are properly made contingent upon an event which is not claimed to have happened. The writ is therefore denied.

WRIT DENIED.