L. V. CARLTON, Appellant, v. JOHN M. GRIMES, Treasurer of State, et al., Appellees.

No. 46879.

July 29, 1946.

914

D. C. Nolan and Edward L. O'Connor, both of Iowa City, for appellant.

John M. Rankin, Attorney General, R. G. Yoder, First Assistant Attorney General, G. H. Clark, Special Assistant Attorney General, Herbert J. Ries, Special Assistant Attorney General, Jack C. White, County Attorney, for appellees.

Bliss, J.—Chapter 136 of the Acts of the Fifty-first General Assembly of Iowa, known as Senate File 229 of that assembly, amended section 4644.11, Code, 1939 (section 309.11, Code, 1946), by increasing the tax millage on taxable property leviable annually by county boards of supervisors for secondary-road maintenance, and amended section 5093.03, Code, 1939 (section 324.2, Code, 1946), to increase the license fee or tax on motor-vehicle gasoline fuel from three cents per gallon to four cents per gallon, and amended section 5093.35, Code, 1939 (section 324.63, Code, 1946), to provide that one cent of the four-cent gasoline tax should be apportioned so that three fifths thereof would be credited to the secondary

road construction fund of the various counties according to the area of each and that two fifths of said one-cent tax would be credited to the street construction fund of the several incorporated cities and towns of the state in the ratio of their respective populations to the total population of all such cities and towns according to the last federal census.

The suit was begun May 24, 1945. The statute became effective July 4, 1945. On July 3, 1945, Judge H. D. Evans, of the Eighth Judicial District of Iowa, entered an order in the District Court of Johnson County, Iowa, directing the Treasurer of the State to collect the additional one-cent tax and to segregate it and deposit it in banks designated by said court to await its further order on the final determination of this suit. The amount collected approximates $6,000,000.

Briefly stated, the chief contentions of the appellant and grounds relied upon for reversal are: first, that S. F. 229 was not passed as required by the Constitution of Iowa in that said act was amended after being voted upon in both houses of the legislature and was not voted upon or passed in the final form as signed by the president of the senate and the speaker of the house and approved and signed by the governor and filed in the office of the secretary of state; and, second, that S. F. 229 violated section 29 of Article III of the Constitution of Iowa in that it contained more than one subject.

The history and legislative course of S. F. 229 through the Fifty-first General Assembly of Iowa, as shown by the journals of each of its chambers, is, in substance, as follows: The journal of the Senate states that S. F. 229, entitled "a bill for an act to amend section four thousand six hundred forty-four and eleven hundredths (4644.11), Code, 1939, relating to secondary roads and optional maintenance levies," was introduced in the Senate on February 8, 1945, read the first and second times, and passed on file. In accord with the legislative practice and the rules of procedure of the General Assembly of Iowa, the bill was not recorded or set out in full in the journal. It appears in the record before us only by a photostatic copy, Exhibit G, of the original bill filed in the office of the secretary of state. The secretary testi-

fied that "all bills whether passed, [or] enacted on at the end of the session are filed and left in our office." This is probably done under authority of section 52, Code, 1939 (section 3.6, Code, 1946), which provides that "the original acts of the general assembly shall be deposited with and kept by the secretary of state." Entitled as above stated, the original bill was as follows:

"Be It Enacted by the General Assembly of the State of Iowa:

"SECTION 1. Section four thousand six hundred forty-four and eleven hundredths, (4644.11), Code, 1939, is hereby amended by striking from line six (6), the words 'one and one fourth' and by inserting in lieu thereof, the word 'two' and further amend said section by inserting the words 'and towns' immediately following the word 'cities' at the end of line eight (8). Further amend by striking the word 'three' in line ten (10) and substituting in lieu thereof the word 'five' (5)."

The last line was added to the original bill in the Senate on March 6, 1945, before it ever came to the House, by the adoption of an amendment offered by Senator Sharp.

The Senate Journal also shows the following matters: The bill was assigned to the ways and means committee and by it reported for passage. Later the sifting committee recommended that it be placed on the calendar. On March 6, 1945, the bill on motion was read a third time, and on the question "Shall the bill pass?" the yea-and-nay vote as entered on the journal, on a roll call naming each senator was "Ayes, 48, Nays, none. Absent or not voting, 2." The journal also states:

"The bill having received a constitutional majority was declared to have passed the Senate and the title was agreed to. Senator Lucas moved that the vote by which the bill passed the Senate be reconsidered and that the motion to reconsider be laid on the table, which motion prevailed."

The following matters are shown on the House Journal: S. F. 229 on March 7, 1945, was received in the house, and

was there read the first time and referred to the committee on roads and highways. On March 14, 1945, Fimmen of Davis filed an amendment to the bill. The amendment was later withdrawn. On March 19, 1945, Colburn, of Shelby, filed and moved the adoption of the following amendment:

"Amend by adding new sections thereto as follows:

"Sec. 2. Section four (4), chapter one hundred sixty-five (165), Acts of the Fiftieth General Assembly, is hereby amended by striking from line one (1) of said section the words and figures 'three cents (3c)' and substituting in lieu thereof the words and figures 'four cents (4c)'.

"Sec. 3. Section thirty-five (35) of chapter one hundred sixty-five (165), Acts of the Fiftieth General Assembly, is hereby amended as follows:

"a. By striking the word 'all' from line two (2) of said section and substituting in lieu thereof the words 'three cents per gallon'.

"b. By adding to said section the following: 'The net proceeds of one cent per gallon license fees and penalties collected under the provisions of this chapter shall be distributed as follows: Three-fifths thereof shall be credited to the secondary road construction fund of the several counties of the state. The treasurer shall apportion said three-fifths portion among the counties of the state in the ratio that the area of each county bears to the total area of the state and shall on the first day of each month remit to the treasurer of each county the amount apportioned to the secondary road construction fund of the county. Two-fifths thereof shall be credited to the street construction fund of the several incorporated cities and towns of the state, which fund is hereby created, for the construction, reconstruction, repair and maintenance of roads and streets in such cities and towns. The treasurer shall apportion said two-fifths portion among the incorporated cities and towns of the state in the ratio that the population of each such city or town bears to the total population of all such cities and towns of the state, as shown by the latest Federal census, and shall, on the first day of each month, remit to the city clerk of each such city or town the amount so apportioned to the street construction fund of such city or town.'

"Sec. 4. Amend the title by adding thereto the following:

" 'and to provide additional revenue for the construction and maintenance of secondary roads by amending certain sections of chapter 251.3, Code, 1939, as amended by chapter 165, Acts of the 50th General Assembly.' "

Avery, of Clay, raised the point of order that the amendment was not germane to the bill. The speaker ruled the point not well taken since the amendment referred to secondary roads and revenue for their maintenance and provided for an additional gasoline tax of one cent, the proceeds thereof to be apportioned between the counties for secondary-road construction and maintenance and the excepted cities and towns referred to in section 4644.11, so that the subject matter of the bill remained the same but enlarged the distribution of the additional revenue from the increase in the gasoline tax. A motion that the bill be made the first order of business on March 20, 1945, on a demanded roll call carried with 78 ayes, 23 nays, and 7 absent or not voting. On March 20, 1945, an attempt to rerefer the bill and all pending amendments to the sifting committee was lost on a roll call of 27 ayes and 71 nays, as were amendments of Schwengel of Scott and of Farmer of Linn, by roll-call votes of 23 ayes, 74 nays, and 14 ayes and 86 nays.

On a demanded roll call the Colburn amendment was adopted by a vote of 78 ayes, 23 nays, and 7 absent or not voting. An amendment to the bill to transfer $1,500,000 from the primary-road fund to a secondary-road aid fund was lost. The House Journal then shows the following proceedings:

"Colburn moved that the bill be read a last time now and placed upon its passage, which motion prevailed, and the bill was read a last time. On the question 'Shall the bill pass?' The ayes were, 85 * * * [naming them]. The nays were, 16 * * * [naming them]. Absent or not voting, 7 * * * [naming them]. The bill having received a constitutional majority was declared to have passed the House and the title as amended was agreed to."

The customary motion to reconsider the vote was made and tabled.

The Senate Journal shows the following matters: Senator Doud called up for consideration S. F. 229, as amended by the House. Action on it was deferred to March 22, 1945. Other motions were made and withdrawn. The Senate Journal further states that on March 22, 1945, motion for the previous question on the bill prevailed and:

"Senator Doud moved that the bill be read a third time now, which motion prevailed, and the bill was read a third time. On the question 'Shall the bill pass?' the vote was * * * Ayes, 41 [naming the senators]. Nays, 8 [naming them]. Absent or not voting, 1 [naming him]. The bill having received a constitutional majority was declared to have passed the Senate. Senator Doud asked and received unanimous consent to correct the title to conform to the bill."

The usual motion to reconsider the vote was made and tabled.

The journals of the House and Senate each show that on March 23, 1945, the joint committee on enrolled bills submitted to the Senate and the House, and moved its adoption, their report that it had examined and found S. F. 229 correctly enrolled. Both chambers adopted the report. These journals show that the speaker of the house and the president of the senate, each in the presence of the respective body over which he presided, signed the bill, and on the same day, March 23, 1945, the Senate Journal states that its committee on enrolled bills reported to the Senate that it had that day sent to the governor of the state for his approval and signature S. F. 229 duly enrolled. On March 28, 1945, the Senate Journal states that a communication was received from the governor announcing that on March 27, 1945, he had approved the bill.

The record on this appeal establishes that after the passage of S. F. 229, as amended by the House, and it had been enrolled by the Senate's committee on enrollment and then certified as correct by the joint enrollment committee, and was authenticated by the presiding officer of each chamber, and approved by the governor, as evidenced by his signature thereon, the enrolled bill was delivered into the charge and custody

of the secretary of state as required by section 85, Code, 1939, (section 9.1, Code, 1946). A photostatic copy of S. F. 229, so deposited, certified by the secretary of state, is in evidence, and, with all other exhibits, has been certified to this court.

Under the Rules of Procedure of the Fifty-first General Assembly—and they are in substance the same as all preceding assemblies—the secretary of the senate and the chief clerk of the house, with their assistants, keep the record of the legislative proceedings in each chamber. It is their duty to see that the journals of each day's proceedings are correctly and fully kept and fully made up and printed for the next day's session. They are responsible for their safekeeping. It is the general rule in each chamber, as an order of business, to correct the journal record of the previous day. These officers, by statute, are required to preserve copies of the printed daily journals of their respective bodies, as corrected, certify to their correctness, and file them with the secretary of state at the adjournment of the legislature, who shall cause them to be bound and preserved as the original journals of each chamber. Section 13, Code, 1939 (section 2.9, Code, 1946). The journals of the Fifty-first General Assembly so filed were introduced in evidence together with photostatic copies of such parts thereof as either party desired to introduce.

I. Taking up first the contention of the appellant that the legislature violated the requirements of the Constitution of Iowa in the mechanics of the enactment of S. F. 229, we set out the pertinent sections of that instrument:

Section 9, Article III. "Each house shall * * * keep a journal of its proceedings, and publish the same; determine its rules of proceedings * * * and shall have all other powers necessary for a branch of the General Assembly of a free and independent State."

Section 10, Article III. "Every member of the General Assembly shall have the liberty to dissent from, or protest against any act or resolution which he may think injurious to the public, or an individual, and have the reasons for his dissent entered on the journals; and the yeas and nays of the members of either house, on any question, shall, at the desire of any two members present, be entered on the journals."

Section 15, Article III. "Bills may originate in either house, and may be amended, altered, or rejected by the other; and every bill having passed both houses, shall be signed by the Speaker and President of their respective houses."

Section 16, Article III. "Every bill which shall have passed the General Assembly, shall, before it becomes a law, be presented to the Governor. If he approve, he shall sign it * * *."

Section 17, Article III. "No bill shall be passed unless by the assent of a majority of all the members elected to each branch of the General Assembly, and the question upon the final passage shall be taken immediately upon its last reading, and the yeas and nays entered on the journal."

In the section of Article III on departments of government—the first section in the Article—it is provided that:

"The powers of the government of Iowa shall be divided into three separate departments—the Legislative, the Executive, and the Judicial: and no person charged with the exercise of powers properly belonging to one of these departments shall exercise any function appertaining to either of the others, except in cases hereinafter expressly directed or permitted."

Section 1 of Article III provides that "the Legislative authority of this State shall be vested in a General Assembly" of two chambers, a House and a Senate.

In section 9, Article III, supra, is the mandate that each house of the assembly shall keep a journal of its proceedings. There is no constitutional mandate as to just how, or in what manner, the journal of the proceedings shall be kept.

"In the absence of a statutory or constitutional requirement regulating the keeping of journals, the entries may be of a most cursory nature." (Citing authorities.) Crawford, The Construction of Statutes (1940), section 46.

A constitutional provision directing each house to keep journals of its own proceedings does not require entries to be made of every action taken on proposed amendments to pending bills. State ex rel. Lane Drug Stores v. Simpson, 122

Fla. 670, 166 So. 262, affirmed on rehearing, 122 Fla. 582, 166 So. 227. The only absolute command as to any specific part of the proceedings which must be entered on the journal is the one in section 17 that, ''the question upon the final passage shall be taken immediately upon its [the bill] last reading, and the yeas and nays entered on the journal.'' It is only the yeas and nays on the *''final passage''* of a *''bill''* which must be entered on the journal. This mandate must always be complied with whether demanded or not demanded. The entry on the journal of the yea-and-nay vote is not required on an amendment to a bill, or on any other matter or question in the course of the bill's enactment, except as stated in section 10, Article III, supra. In that section it is provided that a member of the Assembly may have his protest or dissent, respecting any act or resolution, entered on the journal, and the ''yeas and nays of the members of either house, on any question, shall, at the desire of any two members present, be entered on the journals.''

▪ There is no requirement in the Iowa Constitution that any bill proposed, engrossed, enrolled, or enacted, or any amendment thereto, or substitute therefor, must be entered on any journal. Therefore the best and the only recorded legislative evidence *of the text and content* of any bill enacted is the enrolled bill authenticated by the signatures of the presiding officers, signed and approved by the governor, and deposited in the office of the secretary of state.

▪ The practice of reading any proposed bill to legislative bodies has been followed since their inception. It has been a practice quite uniformly recognized that every bill should be read three times, usually on different days. The constitutions of some of the states require this. There is no such provision in the Iowa Constitution. There is no express requirement that a bill be read any specified number of times before its enactment. The words ''its last reading'' in section 17, supra, may imply previous reading or readings, and yet a ''last reading'' may be a first, second, third, or other reading. The purpose of any provisions for reading a bill is to inform the legislature concerning the nature of the proposed enactment and to prevent hasty legislation. Since all bills are

promptly printed and copies are given to each member, and a file thereof is kept on his desk, the matter of reading bills to each assembly has become of less importance and is not so much stressed in constitutions or assembly rules. See sections 259, 260, and 261, Code, 1939 (sections 17.15, 17.16, and 17.17, Code, 1946), for provisions relative to printing legislative journals and proceedings. In the Legislature of Iowa, and in many legislatures, a reading of the title is considered sufficient except for the last reading. Senate Rule 17 of the Fifty-first General Assembly provided that "Every bill * * * shall have received three several readings previous to its passage; but no bill * * * shall have its second and third readings on the same day, without a suspension of this rule, except on the last legislative day * * *." Rule 44 of the House Rules of the Fifty-first General Assembly states: "Every bill shall receive two readings but no bill shall receive its first and last readings on the same day." There is no mandate in the Constitution that the fact of any reading shall be entered on the journal. As said in Luce on Legislative Procedure (1922), 210: "Iowa legislators are not hampered by any constitutional obstacles in the matter."

With the exception of the few mandatory provisions noted the Constitution of Iowa has given the general assembly a free hand in determining its rules of procedure. Whether either chamber strictly observes these rules or waives or suspends them is a matter entirely within its own control or discretion, so long as it observes the mandatory requirements of the Constitution. If any of these requirements are covered by its rules, such rules must be obeyed, but the observance or nonobservance of its remaining rules is not subject to review by the courts. Miller v. City of Oelwein, 155 Iowa 706, 711, 136 N. W. 1045.

There is no controversy in the evidential record and it is short. The appellant offered in evidence the House and Senate Journals, and photostats of portions of each pertaining to S. F. 229, a photostatic copy of the original bill, S. F. 229 (Exhibit G), and within the folder was a photostatic copy of the House amendment to the bill, though the latter

was not referred to in the verbal offer of the exhibit. Appellant also offered copies of H. F. 364 and S. F. 292, companion bills offered for an increase in the gasoline tax from three cents to four cents, but these bills were never enacted.

To these exhibits the appellees offered three-fold objections, substantially as follows: 1. Incompetent, irrelevant, and immaterial, not the best evidence, surplusage, and an attempt to impeach the verity of a duly enrolled, signed, approved, and filed enactment known as S. F. 229. 2. The enrolled and filed bill constitutes conclusive and exclusive proof of the *text* of S. F. 229 under the ruling of Smith v. Thompson, 219 Iowa 888, 258 N. W. 190, and no other evidence is material or competent. 3. Object to every part of journal records except record of final reading, vote, and passage as shown on pages 834, 835 of House Journal, as surplusage and an attempt to impeach the verity of said enactment as enrolled, signed, approved and filed. Exhibit K, a photostatic copy of S. F. 229, as deposited in the office of the secretary of state, was offered by all parties.

In brief, the contentions of appellees are that Exhibit K is conclusive and exclusive proof of its verity not only as to its text but to the regularity and constitutionality of its enactment, but if it be conceded, solely for the purpose of argument, that the proposition just stated is incorrect and the rule of admissibility stated in Smith v. Thompson, supra, is the correct one, nevertheless the evidence offered by appellant fails to impeach the verity of the bill in any respect. They further contend that since evidence of the original S. F. 229 is extrinsic of even the journals, it is inadmissible.

The appellant insists that not only the journal proceedings in the legislative course of S. F. 229 are admissible but that Exhibit G, which is outside of that record, and Exhibits H. 1 and I. 1 (copies of H. F. 364 and S. F. 292) are also admissible and impeach the enrolled bill. He puts much reliance upon the rule of Smith v. Thompson, supra, while appellees urge that the rule therein stated is unsound and should be overruled; yet they contend that such overruling is not essential to an affirmance of the decree.

II. Before discussing that particular holding in Smith

v. Thompson, supra, we will refer briefly to the prior decisions of this court on the legal question involved therein. No one will contend that the commands of the Constitution should not be obeyed by the general assembly in the enactment of legislation, but that is not the question in this case nor was it the issue in the multitude of cases which have passed upon the matter. The only question in those cases, and in this one, is what evidence is admissible to sustain or defeat the enactment of the particular statute involved. The inquiry for the court is the nature of the evidence upon which it may act when the issue is as to the lawful enactment of a legislative act. In other words, Is the bill, duly enrolled, signed, approved, and filed in the office of the secretary of state, conclusive proof of its absolute verity in all respects, or may it be impeached by the journal records of the general assembly which enacted it? By "verity in every respect" we mean two things: one, that the verbal content of the bill is correct and it is not challenged because of improper textual omissions or additions; two, that it was duly enacted in conformity with all requirements of the Constitution, because in no other way can the legislative will become a law. After a bill has been passed by both chambers of the general assembly in exactly the same form it is ready to be enrolled. Enrollment is the preparation of a copy of the act passed for the signatures of the authenticating officers and the approval of the governor. Enrollment in the Iowa Legislature is always done by the enrolling clerk of the originating house. All of the amendments which have been made in the course of the proceedings through both houses are incorporated in the enrolled bill. The caption "A Bill For" is left off, so that the title reads "An Act." After the enrollment of the bill it is signed by the recording officer of the originating house as a certification of its true origin. The bill is then examined by the committee on enrolled bills of the originating house and later is re-examined by a standing joint committee on enrolled bills, composed of members from the House and the Senate, to see that the enrolling clerk has copied the bill correctly and properly inserted all amendments and corrections. The committees on enrolled bills are required to compare the en-

rolled bills with the engrossed bills—those prepared for the last reading—and with the amendments that have been made, and report their findings to the legislature. The committee on enrolled bills of the originating house reports only to that house, while the joint committee reports to both houses. The chairman of each branch of the joint committee signs a certificate on behalf of the committee that the bill was found correctly enrolled, which certificates are attached to the bill. If the reports are approved they are adopted by each house. After their adoption the bill is signed by the president of the senate and the speaker of the house as required by section 15 of the Constitution. This is done in the presence of the Senate and the House respectively. These signatures are prescribed by the Constitution for the legal authentication of the legislative action expressed in the bill. After signing a bill the presiding officer announces that he has signed the particular bill in the presence of the house. It is this bill so signed that is ordinarily designated as the enrolled bill. See Iowa Manual of Legislative Procedure, compiled and published by the State Historical Society of Iowa in 1917, under the direction of its superintendent, Benjamin F. Shambaugh, in accordance with a concurrent resolution of the Thirty-seventh General Assembly, and re-edited and published in 1939 through an appropriation of the Forty-eighth General Assembly, pages 92–94, 123, 124 of the later edition, from which we have drawn freely. After its authentication by the legislative officers the enrolled bill is sent to the governor for his approval. If he approves it he evidences the date of his approval by his official signature and notifies the originating house of his action and files the bill with the secretary of state. The enrolled bill involved in this appeal (chapter 136, Acts of the Fifty-first General Assembly, sections 4644.11, 5093.03, and 5093.35, Code, 1939 (sections 309.11, 324.2 and 324.63, Code, 1946)) on file in the office of secretary of state, bears the following official signatures and certificate:

"Kenneth A. Evans, President of the Senate
Harold Felton, Speaker of the House
I hereby certify that this Bill originated in the Senate

and is known as Senate File No. 229, Fifty-first General Assembly.

W. J. Scarborough
Secretary of the Senate

Approved March 26, 1945
Robert D. Blue,
Governor.''

. . The common-law rule is that the enrolled bill, nothing to the contrary appearing on its face, is an absolute verity, is conclusive of its textual content and of its lawful enactment, and cannot be impeached by the legislative journals or evidence extrinsic of the journals. This is the rule of the English courts, the federal courts, and of many of the state courts. Crawford, The Construction of Statutes, supra, section 139; 1 Sutherland, Statutory Construction, 3d Ed., footnote, pages 227–229. .

. Other courts apply the rule that the enrolled bill imports absolute verity in a modified form. They hold that the enrolled bill is a verity and conclusively proves that the general assembly complied with all constitutional provisions, excepting those provisions of the Constitution compliance with which is expressly required to be shown on the journals.

There are other courts which hold what is sometimes designated as the journal-entry rule, which is that the enrolled bill is not a verity but is prima facie evidence that the legislature met *all* constitutional requirements, but the journals are admissible to rebut the prima facie presumption. Under this rule the failure of the journals to show that proceedings required by the constitution to be entered on the journal were had rebuts the presumption that the proceedings were taken and impeaches the bill. But if the silence of the journal is with respect to a matter which the Constitution does not require to be shown on the journals it is not sufficient to rebut the presumption of the enrolled bill. In such case the journals must go further and affirmatively show noncompliance with the requirement.

Even the courts which do not subscribe to the conclusiveness of the enrolled bill agree that all impeaching evidence is restricted to the enrolled bill itself and the legislative jour-

nals. Crawford, The Construction of Statutes, supra, section 143; 1 Sutherland, Statutory Construction, supra, 3d Ed., section 1408. The latter authority in the same section states that even the original bill (Exhibit G on this appeal) or the engrossed bill are inadmissible to impeach the enrolled bill or contradict the journal. Citing State ex rel. McKinley v. Martin, 160 Ala. 181, 48 So. 846, 848; In re Granger, 56 Neb. 260, 76 N. W. 588; State v. Abbott, 59 Neb. 106, 80 N. W. 499; State ex rel. Walbridge v. Jones, 1900, 22 Ohio Cir. Ct. 682.

 The power to determine the regularity of the passage of a legislative enactment is vested in the courts. Portland Gold Mining Co. v. Duke, 8 Cir., Colo., 191 F. 692; Standard Underground Cable Co. v. Attorney General, 46 N. J. Eq. .270, 19 A. 733, 19 Am. St. Rep. 394; Lyons v. Woods, 153 U. S. 649, 14 S. Ct. 959, 38 L. Ed. 854; Sherman v. Story, 30 Cal. 253, 89 Am. Dec. 93; Sims v. Weldon, 165 Ark. 13, 263 S. W. 42. But there are limits to which they may go in such proceedings. Inquiry may not be made into the qualification of the members of the legislature. Matters of parliamentary law and the failure of the legislature to observe its rules of procedure, insofar as they are not required by the Constitution, must not be considered. The courts will determine only whether the legislature complied with the requirements of the Constitution in enacting the challenged bill. But there is a presumption that such provisions of the Constitution have been complied with by the legislature, both as to substance as well as to form and enactment. Crawford, The Construction of Statutes, supra, section 138, and decisions cited.

This court quite consistently, from its earliest decision in State v. Clare, 5 (Cole) Iowa 509, down through State v. Donehey, 8 Iowa 396; Duncombe v. Prindle, 12 Iowa 1, 11; Conly v. Dilley, 153 Iowa 677, 691–694, 133 N. W. 730; Miller v. City of Oelwein, supra, 155 Iowa 706, 710, 711, 136 N. W. 1045; State ex rel. Hammond v. Lynch, 169 Iowa 148–171, 151 N. W. 81, L. R. A. 1915D, 119; to Davidson Bldg. Co. v. Mulock, 212 Iowa 730, 739–751, 235 N. W. 45, had aligned itself with those courts and authorities which have supported the conclusive enrolled-bill rule. In some of the

cases that support has been by perhaps technical dicta. But the question was argued and, if what the court said could be called dicta, it was sound, judicial dicta and definitely declared the mind of the court. This is particularly true of the masterly treatment of the question by Justice Ladd in State ex rel. Hammond v. Lynch, supra, 169 Iowa 148, 151 N. W. 81, L. R. A. 1915D, 119, and by Justice Wagner, in Davidson Bldg. Co. v. Mulock, supra, 212 Iowa 730, 235 N. W. 45. In State v. Lynch, Chief Justice Deemer and Justices Evans, Gaynor, Preston, and Salinger concurred and Justice Weaver took no part. In the Davidson Building Company case there was a dissent by Chief Justice Faville and Justice Stevens on another point but no member of the court dissented on the question here involved. These two decisions reviewed at length the prior decisions of this court and able decisions from other courts. In Davidson Bldg. Co. v. Mulock, supra, the opinion disapproved of some comment in Dayton v. Pacific Mut. L. Ins. Co., 202 Iowa 753, 756–759, 210 N. W. 945, 947, but the closing words of the latter opinion were:

"From this review it is quite apparent that there is no link missing in the legislative chain, and the enrolled bill is the exclusive and conclusive evidence, and ultimate proof of the legislative will. State ex rel. Hammond v. Lynch, 169 Iowa 148."

Smith v. Thompson, supra, 219 Iowa 888, 258 N. W. 190, which involved the reduction of the salaries of state, county, city, town, and township officers, was an attack upon the constitutional enactment of chapter 89 of the Laws of the Forty-fifth General Assembly, commonly known as the Salary Reduction Act. Referring to the decisions just above mentioned, the opinion, on pages 906 and 907 of 219 Iowa, page 200 of 258 N. W. stated:

"All prior decisions of this court touching the questions here determined are overruled so far as they may conflict with the holding herein announced."

The particular holding is:

"We are of the opinion that the rule should be that an enrolled bill which bears the signature of the presiding officers of both houses and the governor, and filed in the office of the secretary of state, is the exclusive and conclusive proof and evidence of the text of the law as announced in such bill. And that such bill cannot be impeached except and unless it shows upon its face that it violates some constitutional provision, or that it be shown, by records which the constitution requires be kept by the legislature, that some mandatory provision of the constitution has not been complied with in its passage by the legislature, or the signing by the officers whose signatures the constitution requires to be attached thereto."

Just what is meant by the part of the quotation after the last comma is not clear, as the proposition apparently assumes the authenticity of the signatures. Justice Stevens, to whom the case was assigned, attached his opinion, which had not been adopted by the court, as a dissenting opinion. The appeal was ably presented by the attorneys for the appellants and appellees, and by amici curiae on behalf of the appellees. There was criticism of the majority opinion on the particular issue above mentioned. See articles in 21 Iowa L. Rev., pages 538 et seq. and 573 et seq.

The statement of the facts, in the majority opinion and in the dissent, as to the proceedings in the journals of the legislature showing the course of the bill, cannot be reconciled. From the opinions it appears that House Files 290, 291, 292 for the reduction of the salaries of different classes of public officers originated in and were passed by the House. In the Senate they were sent to the sifting committee and were never reported out, but in their place, a single bill, S. F. 479, covering the same subject matter, was reported out and placed on the calendar. The record of the case in this court and the journals of the Forty-fifth General Assembly show that S. F. 479 as introduced in that chamber was amended by a subcommittee of the committee on reduction of public expenditure, and thereafter, on April 12, 1933, the amended bill was read a third time and was duly passed on a roll-call yea-and-nay vote which was entered on the Senate Journal. The title was then amended and agreed to. The bill was at once messaged

to the House, there called up for consideration, and read the first and second time. It was amended in almost every if not every section, read a third time, and upon the question, "Shall the bill pass?" the bill was adopted on a roll-call yea-and-nay vote which was entered in the House Journal. On the same day the Senate received a message from the House stating that it "has amended and passed [Senate File 479] in which the concurrence of the House was asked." On the question "Shall the Senate concur?" in the House amendments, the roll-call yea-and-nay vote entered in the Senate Journal was against concurrence. On the same day, April 15, 1933, the House received the Senate's refusal to concur in the House amendments. The question "Shall the House insist upon its amendments to S. F. 479?" was adopted on a demanded roll-call yea-and-nay vote which was entered on the journal. The speaker, on April 17, 1933, appointed five members of the House to the joint conference committee to act on S. F. 479. On that day the action of the House was messaged to the Senate and the president appointed five of its members to the conference committee. On April 19, 1933, the joint conference committee agreed upon and sent to the Senate and to the House a report on S. F. 479—not "a fragmentary report" but one amending practically every one of the fifty-seven sections of the bill as amended by the House, and filling substantially six pages of each journal. On April 20, 1933, the conference committee filed and sent a supplementary report on S. F. 479 to the House and to the Senate which requested:

"That the House recede in its amendments to the Senate File No. 479, as it passed the Senate, and that the said bill then be amended in accordance with the first conference committee report filed by this conference committee."

The Senate Journal of April 20, 1933, page 1309, states:

"Senator Stevens of Wapello moved that the Senate adopt the report and the supplemental report of the conference committee on Senate File No. 479, and that the amendments proposed therein be concurred in. Senator Shangle moved the previous question, which motion prevailed. Rule 8 was invoked. On the question, 'Shall the report and supplementary report

be adopted and the amendments as proposed therein be concurred in?' the vote was: Ayes, 30. [naming each senator voting] Nays, 17. [naming them] Absent or not voting, 3. [naming them] The report and supplementary report were adopted and the amendments proposed therein were concurred in.''

On the same day, April 20, 1933, the House Journal, on pages 1521, 1522, states that it had received a message from the Senate of its adoption of the conference committee's reports on S. F. 479:

''Roe of Allamakee moved that the House adopt the report of the conference committee and the supplementary report thereof on Senate File No. 479 and concur in the amendments as proposed therein. On the question 'Shall the House adopt the report of the conference committee on Senate File No. 479 and the supplementary report and concur in the amendments as proposed therein?' a roll call was demanded. The ayes were, 86. [naming the members] The nays were, 10. [naming them] Absent or not voting, 12. [naming them] So the motion prevailed.''

On the same day, the House Journal, pages 1532, 1533, states:

''Mr. Speaker: Your joint committee on enrolled bills respectfully reports that it has examined and finds correctly enrolled, Senate Files Nos. 490 * * * and 479. * * * The Speaker of the House announced that, as Speaker of the House, he had signed in the presence of the House, the following bills: Senate Files Nos. 490 * * * and 479.''

The next item in the House Journal states that a committee of three was appointed to notify the governor that the House was ready to adjourn sine die, which is followed by the statement (page 1534) that the House, at twelve o'clock noon, April 20th, adjourned sine die.

On the same day, the Senate Journal, page 1318, states: that a message was received from the House that it had adopted the conference committee reports on S. F. 479; page 1328, that the joint committee on enrolled bills reported that

"it .has examined and finds correctly enrolled, Senate Files Nos. 490 * * * 479"; that the president of the senate announced that as president, in the presence of the Senate, he had signed S. F. 479; that the committee of the Senate on enrolled bills reported that on April 20, 1933, it had sent to the governor for his approval, S. F. 479; page 1331, that at twelve o'clock noon, April 20, 1933, Governor Kraschel declared the Senate adjourned sine die.

Justice Stevens in his dissent correctly epitomized the legislative course of S. F. 479 through the Forty-fifth General Assembly.

Senate File 479 was enacted strictly as required by the provisions of the Constitution of Iowa, the statutes, and the rules of procedure of each chamber of the Forty-fifth General Assembly of Iowa. The legislative procedure followed was substantially identical with that of all preceding general assemblies in like circumstances. It was the procedure followed by the Forty-fifth General Assembly. It is illuminating to note the House Journal of the Forty-fifth General Assembly shows that Substituted House File No. 73 (chapter 188, Acts of the Forty-fifth General Assembly), which appropriated $6,830,724 for the biennium from July 1, 1933, to June 30, 1935, traveled the same legislative course as S. F. 479, except that it originated in the House. It was amended by the House and duly passed. The Senate amended the bill as received and adopted it. The House amended the Senate amendments and concurred. The Senate refused to concur in the House amendments and insisted upon its amendments. The bill went to a joint conference committee which agreed upon a report and a supplementary report. Both houses adopted the conference committee reports, each without a reading. The bill was reported as duly enrolled, signed by the presiding officers, and sent to the governor, all on April 20, 1933, when the same proceedings were had with S. F. 479.

See, also, the journal proceedings of the following bills, each of which was passed by the adoption by both houses of the Forty-fifth General Assembly of a conference report, without a reading thereof: H. F. 63 (chapter 175, Acts of the Forty-fifth General Assembly); H. F. 238 (chapter 30, Acts

of the Forty-fifth General Assembly); S. F. 131 (chapter 123, Acts of the Forty-fifth General Assembly); and S. F. 477 (chapter 1, Acts of the Forty-fifth General Assembly). And in the Extraordinary Session of the Forty-fifth General Assembly, 1933 and 1934, see the House Journal for the proceedings in H. F. 1 (chapter 82—Taxation: Net Income and Retail Sales); H. F. 292 (chapter 24—Iowa Liquor Control Act); H. F. 304 (chapter 43—School Bond Tax); H. F. 97 (chapter 44). In all, the proceedings were the same as with S. F. 479. Going back still further in the legislative procedure of Iowa general assemblies, it will be found that with respect to the enactment of bills which became laws by the adoption of conference reports the procedure was the same as followed in S. F. 479. See the House Journal of the Eighth General Assembly in 1860 for H. F. 8, and the House Journal of the Thirteenth General Assembly in 1870 for H. F. 1.

Neither contemporaneous nor long-continued legislative practice should be disregarded in determining the regularity or legality of procedure in the enactment of a statute. As said in 12 C. J. 714, section 66(2):

"Legislative Construction. If the meaning of the constitution is doubtful, a legislative construction will be given serious consideration by the courts, both as a matter of policy, and also because it may be presumed to represent the true intent of the instrument. A contemporaneous legislative exposition of a constitutional provision is entitled to great deference, as it may well be supposed to result from the same views of policy and modes of reasoning which prevailed among the framers of the instrument expounded. And the long continued and unquestioned exercise of a given power by the legislature is a weighty consideration in favor of the constitutionality of such exercise of authority, provided such enactments have been uniform."

. . . We have called attention to the fact that the adoption of the conference reports, the adoption of the enrolling committees' reports, the signing of the bill in the presence of each house, and the report of its transmittal to the governor

were all done on the last day of the session of the legislature and shortly before its adjournment, as convincing proof that the members of each chamber were fully aware that they were performing the final steps in the enactment of the bill and that there was to be no further reading of the bill or vote upon it. They intended and knew that the provisions of section 17 of Article III of the Constitution were being complied with.

III. The majority opinion in Smith v. Thompson, supra, 219 Iowa 888, 897, 258 N. W. 190, 196, refers to the adoption of the conference reports by each house on yea-and-nay votes. But on the next page are these statements:

"It nowhere appears in the record that the House ever voted upon Senate Bill No. 479, or that the ayes and nays were called and recorded on the question of the final adoption or passage of the act. * * * Under the record before us, it must be held that the act in question was never before the House for an aye and nay vote on its final passage, and that the adoption of the fragmentary report of the conference committee did not suffice and did not meet the constitutional requirement that a vote 'shall be taken immediately' upon its last reading, and the yeas and nays entered on the journal.'"

This is an erroneous statement of the facts, and a misconception of and an erroneous conclusion as to the law. This holding as to the law was clearly overruled, though not expressly so stated, in Scott v. State Board of Assessment and Review, 221 Iowa 1060, 1062, 1063, 267 N. W. 111. It involved the question of whether H. F. 1 (chapter 82 of the Acts of the Extraordinary Session of the Forty-fifth General Assembly, chapter 329–F1, Code, 1935—personal net income, business tax on corporations, and retail sales tax) had been enacted in compliance with section 17, Article III of the Iowa Constitution. We have already herein referred to the bill as being one enacted in the same manner as S. F. 479. This statement will be confirmed by reading the bill's legislative course on pages 1061, 1062 of the opinion in Scott v. Board, supra, 221 Iowa 1060, 267 N. W. 111. The decision holds that where a bill has had its three readings in each house and

the question upon the final passage has been taken immediately upon its last reading, and the yeas and nays entered on the journals, section 17, Article III, supra, of the Constitution is complied with and it is not essential to the lawful enactment of the bill that a conference report bringing both houses into agreement on the bill shall be read again, or have its "last reading" immediately preceding the vote on the adoption of the conference report. See pages 1062–1065 of the opinion in the Scott case. This is sound law and has the support of the great weight of authority and precedent. The opinion cites the following decisions as sustaining its holding: State ex rel. Pearman v. Liedtke, 9 Neb. 490, 4 N. W. 75; Cleland v. Anderson, 66 Neb. 252, 92 N. W. 306, 96 N. W. 212, 98 N. W. 1075, 5 L. R. A., N. S., 136; State ex rel. Lamar v. Dillon, 42 Fla. 95, 28 So. 781; Hull v. Miller, 4 Neb. 503; School Dist. No. 11 v. Chapman, 8 Cir., Neb., 152 F. 887, 890–892, certiorari denied 205 U. S. 545, 27 S. Ct. 792, 51 L. Ed. 923; Johnson v. City of Great Falls, 38 Mont. 369, 99 P. 1059, 16 Ann. Cas. 974; State v. Crowe, 130 Ark. 272, 197 S. W. 4, L. R. A. 1918A, 567, Ann. Cas. 1918D, 460; Wilson v. Young County H. & F. Co., Tex. Civ. App., 262 S. W. 873; McCulloch v. State, 11 Ind. 424; Brake v. Callison, 5 Cir., Fla., 122 F. 722, affirmed 129 F. 196.

In his dissent in Smith v. Thompson, supra, Justice Stevens said at page 913 of 219 Iowa, page 203 of 258 N. W.:

"There is some diversity of judicial opinion on the subject, but the overwhelming weight of authority holds that the adoption of the report of a conference committee on amendments by a vote of the yeas and nays, without a third reading, meets all of the constitutional requirements. State v. Dillon, 42 Fla. 95, 28 So. 781; People v. Thompson, 2 Cal. Unrep. Cas. 481, 7 P. 142; Board of Com'rs. v. Strait, 36 Colo. 137, 85 P. 178; Johnson v. City of Great Falls, 38 Mont. 369, 99 P. 1059, 16 Ann. Cas. 974; State v. Cronin, 72 Neb. 636, 101 N. W. 325; Browning v. Powers (Mo. Sup.) 38 S. W. 943; Robertson v. People, 20 Colo. 279, 38 P. 326; State v. Ryan, 92 Neb. 636, 139 N. W. 235, Ann. Cas. 1914A, 224; State v. Cox, 105 Neb. 75, 178 N. W. 913; Loomis v. Callahan, 196 Wis. 518, 220 N. W. 816; People v. Edmands,

252 Ill. 108, 96 N. E. 914; Mechanics Building & Loan Assn. v. Coffman, 110 Ark. 269, 162 S. W. 1090; State v. Corbett, 61 Ark. 226, 32 S. W. 686; Callison v. Brake (C. C. A.) 129 F. 196; Stephens v. Board of Commissioners, 79 Kan. 153, 98 P. 790 * * *.''

In Crawford, The Construction of Statutes, supra, section 41, the author states:

''It is the bill, as drafted, that must be read. [Santee Mills v. Query, 122 S. C. 158, 115 S. E. 202.] * * * But the necessity of reading the bill three times on the prescribed number of days in each house does not apply to amendments so as to require bills to be read the required number of times in their amended forms [School Dist. No. 11 v. Chapman, 8 Cir., Neb., 152 F. 887, certiorari denied 205 U. S. 545, 27 S. Ct. 792, 51 L. Ed. 923; People ex rel. Brady v. LaSalle Street Tr. & Sav. Bk., 269 Ill. 518, 110 N. E. 38; Allopathic State Board v. Fowler, 50 La. Ann. 1358, 24 So. 809; State ex rel. Aull v. Field, 119 Mo. 593, 24 S. W. 752; People ex rel. Scott v. Supervisors of Chenango, 8 N. Y. 317; Evanhoff v. State Ind. Acc. Comm., 78 Or. 503, 154 P. 106; State v. Brown, 33 S. C. 151, 11 S. E. 641; Tennessee Coal, Iron & R. Co. v. Hooper, 131 Tenn. 611, 175 S. W. 1146; Capito v. Topping, 65 W. Va. 587, 64 S. E. 845, 22 L. R. A., N. S., 1089. Also see Scott v. State Board of Assessment and Review, 221 Iowa 1060, 267 N. W. 111] * * * since it is proper to count those readings which occurred before amendment. This is likewise true with substituted bills, provided the substituted bill is in effect an amendment and not a new bill. * * * And in the case of substituted bills, so long as they are germane to, or concerned with the same subject matter or embrace the same general principles of the original, a re-reading is not necessary. [Citing cases.] Nor is it necessary that the title remain the same, so long as the bill does not become a new bill by failing to meet any of the requirements just suggested. After all, there is, and properly so, great liberality in favor of a construction which will hold the substituted bill within the scope of the original so as not to require a re-reading. [Citing decisions.]''

The proposition above stated that a reading of the bill or

the bill as amended upon adoption of a conference report is not necessary applies also to a bill amended in any other way. Several of the cases above noted so hold. Others holding that when a bill is passed by one chamber of the legislature and is then amended and adopted by the other the amendment may be concurred in by the first without the readings required on the original passage.

Speaking of constitutional provisions such as section 17 of Article III of the Iowa Constitution, it is said in 26 Am. & Eng. Encyc. of Law, 544:

"The final passage of a bill, within the meaning of such a provision, is the vote on which each house adopts the bill after it has passed its first and second readings and after it has been read again for the purpose of being put upon its passage, and where a bill has been passed in one house and amended and passed in the other, it is not necessary that the vote on the adoption of such amendment by the house in which it was first passed shall be taken by yeas and nays and entered on the journal."

In 59 C. J. 557, section 67, the rule is stated:

"The constitutional requirement that bills be read in course of their passage does not apply to amendments so as to compel bills to be read the required number of times in their amended forms."

For like holdings, see also, Moeller v. Board of Supervisors, 279 Mich. 505, 272 N. W. 886, 889, 890; Cantini v. Tillman, 4 Cir., S. C., 54 F. 969; State ex rel. Turner v. Hocker, 36 Fla. 358, 18 So. 767; Nelson v. Haywood County, 91 Tenn. (7 Pickle) 596, 20 S. W. 1; Miller v. State, 3 Ohio 475; People ex rel. Beardsley v. Wallace, 70 Ill. 680; Hood v. City of Wheeling, 85 W. Va. 578, 102 S. E. 259; Smith v. Mitchell, 69 W. Va. 481, 72 S. E. 755, Ann. Cas. 1913B, 588.

In Capito v. Topping, supra, 65 W. Va. 587, 595, 64 S. E. 845, 848, 22 L. R. A., N. S., 1089, the court said:

"Another contention is that, owing to an alleged irregularity in the legislative proceedings, shown by the journal, the

bill did not pass. This is predicated on an amendment, made on the third reading, although the bill is shown to have had its first and second readings in both houses. We are aware of no law, constitutional or otherwise, requiring a repetition of the readings of bills in their entirety, when amendments are made at late stages of the proceedings."

In State ex rel. Lane Drug Stores v. Simpson, 122 Fla. 670, 675, 166 So. 262, 264, the court said:

"The Constitution requires the yea and nay vote to be taken and entered on the Journals 'on the final passage of every bill,' not on the adoption of amendments proposed by a conference committee of the Senate and House."

The statute in Scott v. Board, supra, 221 Iowa 1060, 267 N. W. 111, was rightly held to have been regularly enacted in compliance with the requirements of section 17, Article III, supra, by the adoption of the conference-committee report by the House, and the court, in Smith v. Thompson, supra, 219 Iowa 888, 258 N. W. 190, in deciding the identical point to the contrary and declaring the statute there involved invalid on that ground was in error.

What we have said in this division of the opinion fully answers the contention of the appellant that S. F. 229, involved in the appeal before us, was not lawfully enacted in compliance with said section 17 of Article III of the Constitution. In support of that contention appellant relies upon the statement in Smith v. Thompson, supra, at page 900 of 219 Iowa, page 196 of 258 N. W., that:

"It nowhere appears in the record that the House ever voted upon the Senate Bill No. 479, or that the ayes and nays were called and recorded on the question of the final adoption or passage of the act."

This holding of the court was erroneous and does not aid appellant.

IV. Seven of appellant's propositions relied upon for reversal are based upon the fact that after the adoption by the Senate of S. F. 229 as amended by the House, Senator

Doud, by unanimous consent, was directed to correct the title to conform to the bill. The bill as originated in the Senate prōvided simply for the increase by the counties of the state of optional maintenance levies for secondary roads. When the bill then came to the House, the Colburn amendment was adopted. This added an additional source of revenue for the benefit of secondary roads, by amending section 5093.03, Code, 1939 (section 324.2, Code, 1946), by increasing the gasoline tax or license fee from three to four cents and giving three fifths of the increase to the secondary-road construction fund and two fifths thereof to a street construction fund for incorporated cities and towns. The Colburn amendment also amended the title of the bill by stating therein that this increase was not only for the "maintenance" of secondary roads but was also for their "construction." The title was also amended by reference to the statutes which were amended by the change in the gasoline tax and the distribution thereof. This was all agreeable to the Senate and it passed the bill as amended by the House.

Many bills are amended before they are finally agreed upon and frequently the titles must be amended. Sometimes this is done by the same amendment which alters the body of the bill but oftentimes the title amendment is postponed until the bill is passed, as it might be wasted effort to do so before that, since the bill might not be adopted. An examination of the journals of any General Assembly of Iowa will disclose hundreds of entries showing that after the passage of a bill "its title was agreed to" or "its title was amended and agreed to" or that "unanimous consent was given to the Chief Clerk of the Senate [or of the House] to correct the title." In House Journal of the Forty-fifth General Assembly, page 574, after the passage of H. F. 290, is this entry: "Roe of Allamakee asked and obtained unanimous consent directing the Chief Clerk to make necessary correction in the title." (H. F. 290 was one of the three bills merged into S. F. 479.) The quotation is the only journal entry concerning the matter. It may be presumed that the correction was made. The journals do not indicate that either chamber thereafter passed upon the correction as made. In none of the numerous instances

where the entry is "the bill was declared to have passed and the title was agreed to" is there any entry as to further action. Whether the title was agreed upon as it was or after alteration does not appear.

In the Iowa Manual of Legislative Procedure (1939 edition), supra, page 119, is this statement:

"If a bill passes, its title is then agreed to. At this time the title may be amended or changed in any manner necessary to make it comply with the constitutional requirement that the subject of every act shall be expressed in the title."

After the amended House bill passed the Senate the title was checked to see that it met constitutional requirements and it was noted that the House in its amendment to the title had omitted reference to one item of the subject matter which the House had put into the bill, to wit, that part of the additional gasoline tax was to be used for the construction and maintenance of roads and streets in cities and towns, and the Senate, by unanimous consent, on request of Senator Doud, who apparently had charge of the bill, directed him "to correct the title to conform to the bill." He, or someone at his direction, made the preliminary correction by interlining with pen and ink the words "and roads and streets in cities and towns" in the amendment attached to the bill as amended by the House. It so appears in the photostat of the amendment attached to Exhibit G introduced by appellant. This photostat also shows on its face the written words "Senate concurs" with the date "Mar. 22, '33" rubber-stamped just below the words. The record does not show who made the interlined correction but it would be a gross interference of the judicial department with the power of the legislative department, under the Constitution, and the exercise of that power in the enactment of statutes, for this court to presume that the correction was a wrongful and unauthorized interpolation. We are bound to presume the contrary, and are bound, as are all courts, to indulge every presumption in favor of the regularity of the proceedings of the legislature in the enactment of its will into statutory law.

The Senate enrolling committee and the joint enrolling

942

committee examined the enrolled bill as prepared by the Senate enrolling clerk and compared it with the engrossed bills as passed by the House and the Senate to see that all corrections and amendments were correctly made and copied. They reported that this was correctly done as evidenced by the enrolled bill and the report was adopted by both chambers of the general assembly. In correcting the title nothing was inserted that the House had not put in the bill and adopted. Both the Senate and the House were fully aware of the nature and extent of the subject matter of the bill as enrolled. Any contention of fraud, mistake, or miscarriage in the passage of the bill has not the slightest basis in the record. The photostatic copy of the enrolled bill (Exhibit K), which all decisions and authorities assert is the best and conclusive evidence of its textual correctness, shows that the direction of the Senate to Senator Doud was complied with.

The enrolled bill, authenticated and approved, as evidenced by the signatures of the officers designated by the Constitution, was the same bill that was duly passed by the Fifty-first General Assembly.

V. Appellant's proposition two is that the bill violated section 29 of Article III of the Constitution, which provides that ''Every act shall embrace but one subject, and matters properly connected therewith; which subject shall be expressed in the title.''

Appellant has subdivided the proposition into a number of closely related points, which may be discussed for the most part under subdivision 6, the statement of which, is:

''It [the bill] was a surreptitious attempt on the part of the legislature, by 'log-rolling,' to combine and pass several distinct, unrelated and incongruous subjects in one so-called Bill when neither one of said subjects could have been passed on its own individual merits.''

The ulterior motive and purpose charged to the legislature are merely conclusions of the appellant without any evidential or reasonable basis. The subject and object of the bill as amended and passed was the procuring of additional revenue

for the construction and maintenance of secondary roads and the roads and streets of cities and towns for the benefit of the users and the respective communities tributary to all of these highways. It was one subject with but a single object, and all matters mentioned in the bill were connected with and germane to both the subject and the object. There is certainly no incongruity between secondary roads and roads and streets in cities and towns. All are public highways which must be constructed and maintained by public revenue. The fact that the revenue is to come from two different sources is neither contrary to the Constitution, or any law or statute, nor does it present any incongruity. Neither does the fact that the secondary roads are to benefit from property levies and the increased gasoline tax and the roads and streets in cities and towns are to benefit only from the gasoline tax or license fees support the charge of unrelation and incongruity. While the four-cent charge per gallon of gasoline or motor-vehicle fuel is spoken of as a license fee, it is clear that the statute providing for it was never intended as a license measure in the true sense. It was intended largely as a revenue measure and not for the sole purpose of regulation. Its purpose and effect is that of a tax law.

There is no statute or constitutional provision against the legislature exercising its taxing power and police power in one act. See Solberg v. Davenport, 211 Iowa 612, 232 N. W. 477; State v. Gish, 168 Iowa 70, 150 N. W. 37, Ann. Cas. 1917B, 135.

Under section 1 (2d) of Article III of the Constitution of Iowa the legislative authority is vested in the general assembly. Under section 9 of the same article each chamber thereof "shall have all other powers necessary for a branch of the General Assembly of a free and independent State." As said in Carroll v. City of Cedar Falls, 221 Iowa 277, 280, 261 N. W. 652, 654:

"The legislature in this state, therefore, has power to enact any kind of any legislation it sees fit, provided it is not clearly and plainly prohibited by the State or Federal Constitutions. * * * It is also the well-settled rule that any doubt

of the legislature's power to adopt an act will be resolved in favor of its constitutionality. [Citing Iowa decisions.]''

The general rule applied in construing said section 29, supra, is thus stated in 50 Am. Jur., Statutes, section 187:

"The title of a statute need not disclose the details of the legislation, or furnish an abstract, analysis, synopsis, catalog, summary, or index of the contents of the act. The constitutional provision cannot be so narrowly construed as to require the title of an act, of itself, to contain the entire act. * * * The details must be sought in the body of the enactment.''

Likewise in 59 C. J. 809, it is said:

"In determining the sufficiency of the title of a statute, under a constitutional provision requiring the subject of an act to be expressed in its title, its language should be reasonably and liberally interpreted, in the light of the general legislative purpose and of prior legislation, and should not be technically or critically construed, nor should it be held insufficient unless the question is free from doubt.''

This court has so many times spoken on the subject and so recently that we will note but a few of the late expressions of the court. In Burlington and Summit Apartments v. Manolato, 233 Iowa 15, 18, 7 N. W. 2d 26, 28, 144 A. L. R. 251, speaking through Justice Garfield, the court said:

"Legislation will not be held unconstitutional unless clearly, plainly, and palpably so. If the constitutionality of an act is merely doubtful or fairly debatable, the courts will not interfere.''

In State v. Talerico, 227 Iowa 1315, 1322, 290 N. W. 660, 663, Justice Oliver well epitomized the essence of the court's holdings on the question, as follows:

"It is held this constitutional provision should be liberally construed so as to embrace all matters reasonably connected with the title and which are not incongruous thereto or have no connection or relation therewith. It was designed to pre-

vent surprise in legislation, by having matter of one nature embraced in a bill whose title expressed another. However, the title need not be an index or epitome of the act or its details. The subject of the bill need not be specifically and exactly expressed in the title. It is sufficient if all the provisions relate to the one subject indicated in the title and are parts of it or incidental to it or reasonably connected with it or in some reasonable sense auxiliary to the subject of the statute. It is unnecessary that each thought or step toward the accomplishment of an end or object should be embodied in a separate act. Nor is it important that a law contain matters which might be and usually are contained in separate acts or would be more logically classified as belonging to different subjects provided only they are germane to the general subject of the act in which they are put.''

In Miller v. Schuster, 227 Iowa 1005, 1014, 1015, 289 N. W. 702, 706, the language of Justice Miller is particularly pertinent in its application to the appeal at bar:

''However, it must be borne in mind that this court, in harmony with the other courts of this country, both state and federal, recognizes that the exercise of its prerogative to declare an act of the legislature unconstitutional is a delicate function, which should be exercised not only with care, but also only in those cases where it is clear, plain and palpable that such decision is required. Before making such decision, we approach the question faced with a presumption that the legislation is constitutional and with an inhibition that we cannot otherwise declare if there is a reasonable doubt on the subject. * * * It is only in extreme cases, where unconstitutionality appears beyond a reasonable doubt, that this court can or should act, unless we are to depart from fundamental and well established principles of construction, which we are convinced are sound and should be adhered to.''

In State v. Cowen, 231 Iowa 1117, 1131, 3 N. W. 2d 176, 184, Justice Hale tersely states the rule thus:

''All that the Constitution requires is that the subject embraced in the act shall be reasonably connected with the

title and germane to it, and that the title shall be calculated to give notice of the statute.''

These cases speak of uniform holdings of all of our decisions on the matter and of the courts generally. The facts in this case bring it well within these definitely established rules. We have answered every contention of appellant and find them to be without merit.

VI. Senate File 229, which is attacked in this case, and the respective bills attacked in Smith v. Thompson and Scott v. Board, supra, were each duly enacted in compliance with the provisions of the Constitution. Neither bill was impeached in any way by the journals of the legislature. It was wholly immaterial under which theory of the enrolled-bill rule the attempt at impeachment was made. The lawful enactment of each bill would have been sustained under any of the theories. But it is very important that the court decide upon a definite rule with respect to the probative force of the enrolled bills on file, and to be filed, in the office of the secretary of state. It is highly important that there be certainty as to the constitutionality of the enactment of those bills. There should be certainty as to whether they are laws or not laws. These bills as filed are the acts of the various general assemblies. They are the original acts, and as such have been copied by Code editors in compiling every Code of Iowa since the Code of 1897. That Code was enacted, as was that part of the Code of 1924 which was passed by the Fortieth Extra General Assembly (Volume I, Iowa Code, 1946, page xx). The people and the public generally, the various departments of government, all the public officers of the state, and the courts look upon the statutes set out in these Codes as the laws of the state. Not the laws maybe, or perhaps, but *the* laws. There is something fantastic and absurd in a court saying and holding: ''No. These Codes of Iowa are not *really* the laws. They are only the laws presumptively, prima facie, and on condition.'' It is perhaps a harsh rule that ignorance of the law excuses no one. But it is a necessary rule. The rule is not so harsh that one is presumed to know the statute law because he may have a Code of Iowa, or if not, one is readily available, and

he may read and know what the statutes provide, or he may consult a lawyer who will turn to the Code and advise him of its provisions. But if what is read is not in fact law he has no chart readily available to inform him as to his legal rights. In that event, under the rule of Smith v. Thompson, supra, and the decisions of this court which have recognized it, or under the journal-entry rule, he must ascertain where the journals of the General Assemblies of Iowa may be found and then go to them or obtain them and search through the thousands of pages of the House and Senate Journals of the particular general assembly and trace the legislative course of the bill he is interested in from perhaps the first days of the legislative session to its adjournment; and if he knows as little about legislative procedure as the average person, he will be more confused as to the law when he completes this burdensome task than he was before he undertook it. And even then he is not in the clear nor can a lawyer make him more certain. Some person may bring an action challenging the validity of a statute because a journal of the legislature does not show that some requirement of the Constitution was complied with, or perhaps the requirement was in fact fully complied with but the journal, through mistake, carelessness, or intent does not show the facts. In either event, if the omission is of a proceeding which the Constitution requires to be entered in the journal, the court must sustain the challenger, under the rule of Smith v. Thompson, supra. The decision in the assumed case settles the matter as between those litigants but it may not settle the law. Some other person may challenge the statute on another ground, or on the same ground, but he may find some additional or different evidence in the journals, or other law, and he may get a different decision. And thus the uncertainty of the law continues.

The courts which follow the modified enrolled-bill rule or the journal-entry rule balk at the conclusiveness of the enrolled-bill rule as an archaic rule of England and the common law. But they are not opposed to conclusive presumptions. They make the journals conclusive and stop there. But they forbid going further and refuse the admission of any evidence that the journal entries may be wrong. See the able

advocacy of the conclusive enrolled-bill rule and the criticism of the other theories of the rule by Wigmore in his work on Evidence, Second and Third Editions, section 1350.

The general assembly is the instrumentality of the legislative department designated by the Constitution to exercise the powers and carry out the purposes of that department. The makers of the Constitution had a definite purpose in requiring the presiding officer of each chamber of the general assembly to sign the enrolled bill. Our decisions, and the courts generally, hold that such signing was intended as the authentication of the bill and the ultimate proof of the true expression of the legislative will and of the regular and constitutional enactment of the bill. As said by Justice Ladd in State ex rel. Hammond v. Lynch, supra, 169 Iowa 148, 155, 151 N. W. 81, 83, L. R. A. 1915D, 119:

"What is the design of exacting the signing of the enrolled bills by the presiding officers of the two houses and the approval of the governor, and that they be deposited with the secretary of state? Is it not that these are the final records of the acts of the legislature for the information and guidance of other departments of government? If so, why should they not be accorded the respect usually accorded solemn records?"

Who is better qualified or in a superior or more advantageous position to determine these facts than the officers designated? Certainly there is no one. It is a most important act and so recognized by every general assembly by a rule that the solemn act must be performed in the presence of each branch of the assembly, accompanied by the announcement of the signer that he is performing the act. We have called attention to the meticulous care with which the bill is enrolled and double checked by committees of each house for any errors. The presiding officers and the other members of the assembly hold high, honorable positions, to which they have been chosen by the voters of the state. They are under oath to support the Constitution. These particular duties must be entrusted to someone, and the Constitution and the general assembly have chosen them as the best qualified. Certainly

they may err, but aren't they less likely to err than the clerks and stenographers, who, in the hurry and distraction of a legislative assembly, must note and set down the daily proceedings and after adjournment compile and condense the record and get it to the printer so that it may be printed and made available for the next day's session? The printer may also make errors and mistakes. We have the highest respect for the efficiency and honesty of those who perform these exacting duties but it appears to this court that the authentication prescribed by the Constitution should be accepted as conclusive proof of the enactment of a bill. The responsibility and the duty belong to the legislature, and the enrolled and signed bill which has been approved and signed by the governor and filed with the secretary of state should be accepted as conclusive proof of the execution of that responsibility and duty. The law recognizes a number of conclusive presumptions of law. This is done because it is regarded as the best public policy. The conclusive enrolled-bill rule has been regarded as in the interest of public policy until the holding to the contrary in Smith v. Thompson, supra, 219 Iowa 888, 258 N. W. 190. The former holding should be restored and readopted.

It is conceded by everyone that this bill is conclusive evidence of what it contains, of the expressed will of the legislature, of the law itself, which cannot be disputed in any way. Certainly the fact so conceded is a most important one, fully as important as and probably more so than any step in the enactment of the bill. If the enrolled bill is accepted as conclusive proof of the first, is there any sound reason why it should not be accepted as proof of the latter?

Most of the states have a constitutional provision similar to section 17 of Article III of the Iowa Constitution and many of these states follow the conclusive enrolled-bill rule. They have expressed its merits far better and much more fully than herein stated. These opinions have been reviewed at length in both State ex rel. Hammond v. Lynch, supra, 169 Iowa 148, 151 N. W. 81, L. R. A. 1915D, 119, and in Davidson Bldg. Co. v. Mulock, supra, 212 Iowa 730, 235 N. W. 45. A few decisions which discuss the question with great ability, among the many which advocate the conclusive rule, are Field v.

Clark, 143 U. S. 649, 12 S. Ct. 495, 36 L. Ed. 294; State ex rel. Reed v. Jones, 6 Wash. 452, 34 P. 201, 23 L. R. A. 340; State ex rel. Pangborn v. Young, 32 N. J. Law 29 (Of these two cases last cited Wigmore said in 2 Evidence, Second Ed., 1043, section 1350: "The opinions * * * are easily the best on the subject both for comprehensiveness and keenness of analysis and for clearness of exposition. The latter opinion is the one best known; but the former * * * would alone render superfluous all the other deliverances on the subject."); Sherman v. Story, 30 Cal. 253, 89 Am. Dec. 93; County of Yolo v. Colgan, 132 Cal. 265, 64 P. 403; Taylor v. Cole, 201 Cal. 327, 257 P. 40; Evans v. Browne, 30 Ind. 514, 95 Am. Dec. 710; State ex rel. George v. Swift, 10 Nev. 176, 21 Am. Rep. 721; Williams v. MacFeeley, 186 Ga. 145, 197 S. E. 225; Lafferty v. Huffman, 99 Ky. 80, 35 S. W. 123, 32 L. R. A. 203, 18 Ky. L. Rep. 17, an able opinion; Golightly v. Bailey, 218 Ky. 794, 292 S. W. 320; Weeks v. Smith, 81 Maine 538, 18 A. 325; Columbus & G. Ry. Co. v. Miller, 160 Miss. 383, 134 So. 847; State ex rel. McTaggart v. Middleton, 94 Mont. 607, 28 P. 2d 186; Kelley v. Marron, 21 N. M. 239, 153 P. 262; Hooper v. Harvey, 62 Ga. App. 224, 8 S. E. 2d 456; Ellison v. Texas Liquor Control Bd., Tex. Civ. App., 154 S. W. 2d 322; In re Block 1, Donly Heights Addition, 194 Okla. 221, 149 P. 2d 265; James v. Gulf Ins. Co., Tex. Civ. App., 179 S. W. 2d 397; State ex rel. Watson v. Gray, 153 Fla. 462, 14 So. 2d 721.

In his dissent in Smith v. Thompson, supra, 219 Iowa 888, 914, 258 N. W. 190, 204, Justice Stevens warned that "the consequences of a reversal of this rule [the conclusive enrolled-bill rule] in any jurisdiction cannot help but work much confusion." The words were prophetic. A number of cases have come to this court attacking important statutes. Among them were Brown v. West, 222 Iowa 331, 268 N. W. 525; State v. Arluno, 222 Iowa 1, 268 N. W. 179; State v. Woodbury County, 222 Iowa 488, 269 N. W. 449; Scott v. Board, supra, 221 Iowa 1060, 267 N. W. 111; Miller v. Schuster, supra, 227 Iowa 1005, 289 N. W. 702, and the one at bar. Also, Witmer v. Polk County, 222 Iowa 1075, 270 N. W. 323.

As noted by Luce, in his work on Legislative Procedure, 210, the Legislature of Idaho in 1899 had to re-enact most of the laws passed from the time Idaho became a state, because of a decision in Cohn v. Kingsley, 5 Idaho 416, 417, 49 P. 985, 38 L. R. A. 74, holding that the failure of the journal to show that each provision of the Constitution was complied with was "conclusive evidence that it was not." This decision was modified by In re Drainage District No. 1, 26 Idaho 311, 143 P. 299, 302, L. R. A. 1915A, 1210.

In Smith v. Thompson, supra, 219 Iowa 888, 903, 258 N. W. 190, the majority opinion refers to the reference by Justice Wagner, in Davidson Bldg. Co. v. Mulock, supra, 212 Iowa 730, 235 N. W. 45, to State ex rel. Pangborn v. Young, 32 N. J. Law 29, noted above as being highly praised by Wigmore, and states that the New Jersey case was overruled by the Supreme Court of New Jersey in In re Application of Hague, 104 N. J. Eq. 31, 144 A. 546. The court was in error in this statement. In the Hague case, one Frank Hague, Mayor of Jersey City, had been arrested on a warrant issued on the joint resolution of the legislature for contemptuous conduct toward the latter body. He applied for a writ of habeas corpus to Vice Chancellor Fallon of the Court of Chancery of New Jersey, who heard the application himself and granted the writ. (104 N. J. Eq. 31, 144 A. 546, supra.) He did not overrule the Pangborn case, and could not, but he distinguished it by saying it applied only to "acts" of the legislature and not to "joint resolutions." A second application by Hague was also made for the writ of habeas corpus on other grounds (a sequence of 104 N. J. Eq. 31, 144 A. 546), which is reported in 105 N. J. Eq. 134, 147 A. 220. The writ was granted. A third suit (103 N. J. Eq. 505, 143 A. 836) was an application to remove the habeas corpus proceedings from Vice Chancellor Fallon because he was biased and prejudiced in favor of Hague. The application was denied. The order issued in 104 N. J. Eq. 31, 144 A. 546, which it is asserted overruled the Pangborn case, was appealed to Court of Errors and Appeals, 104 N. J. Eq. 369, 145 A. 618. It was affirmed by an evenly divided court but the question of the conclusiveness

of an enrolled bill as held in the Pangborn case was not an issue on appeal and was not mentioned or discussed. The holding in the Pangborn case, as an examination of Shepard's New Jersey Citator will show, has never been overruled but it has been followed and approved in a number of decisions. See Bloomfield v. Board of Chosen Freeholders of Middlesex County, 74 N. J. Law 261, 65 A. 890 (Supreme Court of New Jersey); Board of Chosen Freeholders of Passaic County v. Stevenson, 46 N. J. Law 173, 174, and Standard Underground Cable Co. v. Attorney General, supra, 46 N. J. Eq. 270, 276, 19 A. 733, 735, 19 Am. St. Rep. 394, both decided by the Court of· Errors and Appeals, the highest court in New Jersey. In the latter case the court said:

"* * * the judgment [in the Pangborn case] * * * would seem to be impregnable. It has the support of the soundest reason and abundant authority."

It is the judgment of the court that the specific holding in Smith v. Thompson, supra, 219 Iowa 888, 258 N. W. 190, overruling the decisions in Davidson Bldg. Co. v. Mulock, supra, 212 Iowa 730, 235 N. W. 45, and like decisions of this court which hold that the final, conclusive, ultimate, and only evidence of the passage of a bill by both houses of the legislature is the enrolled bill, signed by both the president of the senate and the speaker of the house, approved by the governor, and filed in the office of the secretary of state, should be and it is hereby overruled, as are also any like decisions on this particular point in Scott v. Board, supra, 221 Iowa 1060, 267 N. W. 111, or in other cases following such particular holding in Smith v. Thompson, supra.

It is our conclusion and judgment that in the appeal before us from the judgment and decree of the District Court of Johnson County, Iowa, the appellant has failed to sustain any proposition relied on for reversal, and the judgment and decree is therefore affirmed and the cause is remanded to said district court for further proceedings in conformity herewith. —Affirmed and remanded.

All JUSTICES concur.