# IN THE SUPREME COURT OF IOWA

No. 21–0696

Submitted February 21, 2023—Filed March 24, 2023

**LS POWER MIDCONTINENT, LLC** and **SOUTHWEST TRANSMISSION, LLC,**

Appellants,

vs.

**STATE OF IOWA, IOWA UTILITIES BOARD, GERI D. HUSER, GLEN DICKINSON,** and **LESLIE HICKEY,**

Appellees,

and

**MIDAMERICAN ENERGY COMPANY** and **ITC MIDWEST LLC,**

Intervenor-Appellees

---

Appeal from the Iowa District Court for Polk County, Celene Gogerty, Judge.

Electric transmission companies seek further review of the court of appeals decision affirming the district court's ruling they lacked standing to challenge the constitutionality of anticompetitive legislation. **TEMPORARY INJUNCTION GRANTED. DECISION OF COURT OF APPEALS VACATED; DISTRICT COURT JUDGMENT REVERSED AND CASE REMANDED WITH INSTRUCTIONS.**

Waterman, J., delivered the opinion of the court, in which all participating justices joined. Oxley, McDermott, and May, JJ., took no part in the consideration or decision of the case.

Michael R. Reck (argued), Charles F. Becker, and Erika L. Bauer (until withdrawal) of Belin McCormick, P.C., Des Moines, for appellants.

Brenna Bird, Attorney General, and David M. Ranscht (argued) and Benjamin Flickinger (until withdrawal), Assistant Attorneys General, for State appellees.

Stanley J. Thompson (until withdrawal), Elizabeth R. Meyer, and Tara Z. Hall of Dentons Davis Brown PC, West Des Moines, for intervenor-appellee MidAmerican Energy Company.

Bret A. Dublinske (argued) and Lisa M. Agrimonti of Fredrikson & Byron, P.A., Des Moines, and Amy Monopoli (until withdrawal) of ITC Holdings Corp., Des Moines, for intervenor-appellee ITC Midwest LLC.

Lynn C. Herndon of Nyemaster Goode, P.C., Des Moines, and Kenneth R. Stark of McNees Wallace & Nurick LLC, Harrisburg, PA, for amicus curiae Coalition of MISO Transmission Customers.

Terri C. Davis and Kelly A. Cwiertny of Shuttleworth & Ingersoll, P.L.C, Cedar Rapids, for amicus curiae Resale Power Group of Iowa.

Samantha C. Norris, Haley R. Van Loon, and Jackson G. O'Brien of Brown, Winick, Graves, Gross and Baskerville, P.L.C. for amicus curiae NextEra Energy Transmission, LLC.

**WATERMAN, Justice.**

In this appeal, we must decide whether the district court correctly ruled that qualified would-be competitors in the electric transmission market lacked standing to challenge new legislation that blocks them from bidding against existing Iowa operators on future projects. The statute at issue, Iowa Code section 478.16 (2020), grants "incumbent" Iowa entities a right of first refusal (ROFR) that forestalls competitive bidding. The ROFR repeatedly failed to pass as a stand-alone bill but was enacted in the final hours of the 2020 legislative session as part of a fifty-page appropriations bill. The plaintiffs sued the Iowa Utilities Board to enjoin enforcement of section 478.16 on grounds the enactment violated the single-subject, title, and equal protection provisions of the Iowa Constitution. The district court granted the Board's motion to dismiss on grounds the plaintiffs lacked standing because there were no approved projects to upgrade Iowa's electric grid when the suit was filed.

The plaintiffs appealed, arguing they satisfied standing requirements because such projects were imminent and they were otherwise qualified bidders. We transferred the case to the court of appeals. New projects were announced while the appeal was pending and the plaintiffs moved to stay enforcement of the ROFR. The court of appeals denied the stay, declined to take judicial notice of the new projects, and affirmed the dismissal for lack of standing, stating the plaintiffs "swung before the pitch and cannot satisfy the injury-in-fact prong of our standing test." We granted the plaintiffs' application for further review.

On our review, we hold the district court erred by dismissing this action for lack of standing. The more fitting baseball analogy is that the enactment of section 478.16 took the plaintiffs off the ball field before the game began. The likelihood of future projects satisfies the injury-in-fact requirement for standing. We vacate the court of appeals decision, reverse the dismissal order, and remand the case for the district court to address the constitutional challenges on the merits. Because the plaintiffs have shown a likelihood of success on the merits, we grant a temporary injunction to stay enforcement of section 478.16 pending resolution of this litigation.

## I. Background Facts and Proceedings.

The electricity market involves three main steps: generation, transmission, and distribution. This case is about transmission: how to move electric power from where it is generated to where it is distributed either wholesale or to retail consumers. Congress has enacted massive funding to upgrade our nation's electric grid. The bipartisan infrastructure bill and Inflation Reduction Act have appropriated billions of dollars for electric transmission projects.[1] The plaintiffs in this case, LS Power Midcontinent, LLC, and Southwest Transmission, LLC, (collectively LSP), are among the few entities with the capital and expertise to compete for upcoming upgrades to the electric grid.

Our nation's electric grid is interdependent. For example, PJM Interconnection, one of the largest grid operators in the thirteen eastern states,

---

[1]Inflation Reduction Act of 2022, Pub. L. No. 117-169, § 50151, 136 Stat. 1818, 2046 (2022) (to be codified at 42 U.S.C. § 18715); Infrastructure Investment and Jobs Act, Pub. L. No. 117-58, § 40106, 135 Stat. 429, 934 (2021) (to be codified at 42 U.S.C. § 18713).

generates surplus electricity from fossil fuel plants. "When wind power plunged in the Midwest and central states [in late February 2023], PJM helped fill the gap between supply and demand and kept the lights on." *S.O.S. for the U.S. Electric Grid*, Wall St. J. (Feb. 26, 2023, 4:47 PM), https://www.wsj.com/articles/s-o-s-for-the-u-s-electric-grid-pjm-interconnection-blackout-supply-renewables-subsidy-report-fossil-fuel-4cbdd56e. Efficient transmission is a key component for avoiding grid imbalances that can lead to blackouts. *See id.* (citing PJM report).

The Iowa Utilities Board (IUB) regulates the siting and construction of electric transmission lines in our state pursuant to Iowa Code chapter 478. The Federal Energy Regulatory Commission (FERC) regulates interstate, high-voltage transmission. FERC in turn oversees regional transmission organizations (RTOs). Each RTO coordinates, controls, and monitors the power grid within its region of service. This authority includes planning and approving new transmission projects to be carried out by private entities. Two RTOs, Midcontinent Independent System Operator (MISO) and Southwest Power Pool (SPP), serve Iowa. Missouri-based LSP actively develops, constructs, and manages electric transmission projects in the territory of these two RTOs. LSP currently has no projects in Iowa.

In 2011, FERC took action to lower the cost of grid upgrades. Specifically, FERC directed RTOs to remove federal-level ROFRs in order to increase competitive bidding. *See* Transmission Planning and Cost Allocation by Transmission Owning and Operating Public Utilities, 76 Fed. Reg. 49,841,

49,855 (2011) [hereinafter FERC Order]. The agency reasoned that federal ROFRs might "be leading to rates . . . that are unjust and unreasonable," in large part because "it is not in the economic self-interest of incumbent[s] to permit new entrants to develop transmission facilities," even if those facilities "would result in a more efficient or cost-effective solution." *NextEra Energy Cap. Holdings, Inc. v. Lake*, 48 F.4th 306, 312 (5th Cir. 2022) (alteration and omission in original) (quoting FERC Order at 49,886). Because the Federal Power Act "leav[es] room for state regulation," the FERC Order permits state-level ROFRs. *Id.*; FERC Order at 49,880. That left the door open to the state ROFR at issue here.

**A. The ROFR and Its Effects.** Iowa Code section 478.16(2), enacted in 2020, 2020 Iowa Acts ch. 1121, § 128, gives incumbent electric transmission owners an ROFR[2] to construct, own, and maintain an RTO-approved electric

---

[2]At oral argument, counsel for LSP contended the right granted by Iowa Code section 478.16(2) should not be called a "right of first refusal." He explained the holder of a right of first refusal has a right to match a third party's higher offer on a project or real estate. *See Right of First Refusal, Black's Law Dictionary* (11th ed. 2019) ("For example, if Beth has a right of first refusal on the purchase of Sam's house, and if Terry offers to buy the house for $300,000, then Beth can match this offer and prevent Terry from buying it."). In his view, section 478.16(2) grants a right that is even more restrictive than a right of first refusal because it does not require bid matching; instead, the incumbent transmission owner is automatically entitled to take on a transmission project if it so chooses.

Counsel's point is well taken. Section 478.16(2) more closely resembles a right of preemption, which entitles the holder to the first opportunity to buy before any third parties become involved. *See Right of Preemption, Black's Law Dictionary* (11th ed. 2019) ("For example, if Beth has a right of preemption on Sam's house for five years at $100,000, Sam can either keep the house for five years (in which case Beth's right expires) or, if he wishes to sell during those five years, offer the house to Beth, who can either buy it for $100,000 or refuse to buy. If Beth refuses, Sam can sell to someone else."); *see also Knepper v. Monticello State Bank*, 450 N.W.2d 833, 836 (Iowa 1990) ("A preemption merely requires the owner, when and if he decides to sell, to offer the property first to the person entitled to the preemption.").

Our cases, however, have used "right of preemption" and "right of first refusal" interchangeably. *See, e.g., id.* ("The right granted to the prior owner of agricultural land by section 524.910(2) is sometimes called a right of 'preemption' or of 'first refusal.' "). Both the

transmission line that will be connected to an existing electric facility. Amicus Resale Power Group of Iowa rightly observes the ROFR stifles competition: "The Iowa ROFR Statute creates a right that no market participant would otherwise have—an ability to essentially deny market entry to a potential competitor, and thereby preserve a monopoly role in the development and ownership of additional transmission facilities." The United States Court of Appeals for the Fifth Circuit described a similar electric transmission ROFR as follows:

> Imagine if Texas—a state that prides itself on promoting free enterprise—passed a law saying that only those with existing oil wells in the state could drill new wells. It would be hard to believe. . . .
>
> Texas recently enacted such a ban on new entrants in . . . the building of transmission lines that are part of multistate electricity grids. . . .
>
> . . . .
>
> . . . [T]he ban's interference with interstate commerce [is] as clear as it is for the oil well hypothetical.

*NextEra Energy Cap. Holdings, Inc.*, 48 F.4th at 309–10 (5th Cir. 2022) (reinstating claim under dormant commerce clause).

Section 478.16 defines "incumbent electric transmission owner" as follows:

> (1) A public utility or a municipally owned utility that owns, operates, and maintains an electric transmission line in this state.
>
> (2) An electric cooperative corporation or association or municipally owned utility that owns an electric transmission facility

---

district court and court of appeals called the right granted by section 478.16(2) a "right of first refusal." So did the amici and parties—including counsel for LSP in the briefing. So do we.

in this state and has turned over the functional control of such facility to a federally approved authority.

(3) An [individual or entity who, as of July 1, 2020, owns and maintains an electric transmission line that is required for rate-regulated electric utilities, municipal electric utilities, and rural electric cooperatives in this state to provide electric service to the public for compensation.]

*Id.* § 478.16(1)(*c*). Notably, this definition of incumbent does not include LSP, which operates transmission lines in neighboring states, or amicus NextEra Energy Transmission, LLC, the leading transmission company in North America, which operates fifteen electricity generation facilities in Iowa that generate over 1,300 megawatts using transmission lines (called "gen-tie lines") that connect its wind turbines and solar panels to substations. MidAmerican Energy Company and ITC Midwest, LLC, the two intervenors in this case, fall within this statutory definition of "incumbent."

Section 478.16 further provides that an incumbent electric transmission owner has ninety days to exercise its ROFR. *Id.* § 478.16(3). If it does, the RTO must assign the project to the incumbent. *Id.* If not, the Iowa Utilities Board decides whether another entity can take on the project. *Id.*

LSP is a Qualified Transmission Developer in MISO. As such, it is qualified to complete transmission projects in Iowa. But because it does not currently manage any projects in Iowa and does not meet any of the statutory definitions, LSP is at a competitive disadvantage to incumbent electric transmission owners for future transmission projects. LSP cannot compete for a new transmission project in Iowa unless the incumbent owner chooses to forego its ROFR.

**B. Enacting the ROFR.** LSP identified salient facts about the enactment of the ROFR. The legislature had twice failed to pass ROFRs for incumbent transmission owners. First, in 2018, the senate passed an ROFR. *See* S.F. 2311, 87th G.A., 2d Sess. § 18 (Iowa 2018) (introduced); S. Journal, 87th G.A., 2d Sess., at 556 (Iowa 2018). The house failed to pass most of the bill and dropped the ROFR. H-8340, 87th G.A., 2d Sess. § 1 (Iowa 2018). Then in January 2020, a standalone bill with the ROFR was introduced in the house. H.S.B. 540, 88th G.A., 2d Sess. § 1 (Iowa 2020). But that bill died in subcommittee. *See* H. Journal, 88th G.A., 2d Sess., at 141 (Iowa 2020) (logging last activity advancing bill). The 2020 legislative session was truncated by the COVID-19 pandemic closures. Regardless, undisputed affidavits from legislators of both parties confirm the ROFR lacked the votes for enactment as a standalone bill in 2020.

The ROFR was ultimately enacted through an amendment to the final appropriations bill of the 2020 legislative session. S-5163, 88th G.A., 2d Sess. § 128 (Iowa 2020). The appropriations bill, over fifty pages long and containing thirty-four divisions, was a potpourri of various unrelated subjects. *See* H.F. 2643, 88th G.A., 2d Sess. (Iowa 2020) (enrolled). Besides the ROFR, H.F. 2643 included comprehensive spending provisions, sections 1, 3–7, 9, 11–18, 33–37, 39–44, 46–47, 55, 58–59, 73, 76–77, 82–83, 110–12, 120; the repeal of previous spending provisions, section 2; a provision for alternative venues in civil trials, section 10; suspension of certain Health and Human Services provisions, section 32; provisions for regulations related to COVID-19, section 45; directives to state agencies, sections 53, 54; authorization for the

Iowa State Fair Board to issue and sell revenue bonds, section 72; legislation relating to alarm system contractors, sections 86–89; directives related to economic development, sections 91–94; contingent appropriations, sections 97–101; a provision making some school districts eligible for an adjustment in state foundation aid, section 105; contingent repeal and amendment of hemp regulation, sections 107–08; amendments to the process for obtaining an absentee ballot, sections 123–26; provisions governing when the Board of Regents may hire attorneys, section 127; corrections and amendments to previous legislation and preexisting portions of the Iowa Code, sections 8, 19–29, 38, 49–52, 56–57, 61–69, 80–81, 91–92, 114, 116–17; effective dates for the foregoing, sections 30, 48, 70, 74, 78, 84, 90, 95, 102–04, 106, 113, 115, 118, 121; and retroactivity provisions, sections 31, 60, 71, 75, 79, 85, 96, 109, 119, 122. 2020 Iowa Acts ch. 1121 (codified in scattered chapters of the Iowa Code).

To capture that broad range of subjects, the bill bore a remarkably general title: "An Act relating to state and local finances by making appropriations, providing for legal and regulatory responsibilities, providing for other properly related matters, and including effective date and retroactive applicability provisions." *Id.* The ROFR was added in the final hours, but the existing title was left unchanged. *See* S-5163, 88th G.A., 2d Sess. § 128 (Iowa 2020).

The ROFR was introduced to the Senate at 1:33 a.m. on June 14, 2020—the final day of the legislative session. *Senate Video HF 2643 - Continuing Approps,* Iowa Legislature, at 01:32:02–01:33:24 AM (June 14, 2020),

https://www.legis.iowa.gov/dashboard?view=video&chamber=S&clip=s202006
13085856120&dt=2020-06-14&offset=59814&bill=HF%202643&status=r.
Legislators lamented the inability to understand what they were voting on.
Senator Bolkcom remarked, "It would have been nice to have had this
amendment during the -- during the daytime and had more opportunity to
actually understand what we are voting on, but we are not going to get that
opportunity here in the middle of the night." *Senate Video HF 2643: S-5163 by
Breitbach of Clayton*, Iowa Legislature, at 02:29:22–02:29:40 AM (June 14,
2020), https://www.legis.iowa.gov/dashboard?view=video&chamber=S&clip=s202
00613085856120&dt=2020-06-14&offset=59814&bill=HF%202643&status=r.
Senator Taylor objected to the broad scope of subjects contained in the bill. "It's
one bill instead of nearly a dozen." *Id.* at 02:37:44–02:38:00 AM.

The sponsor of the ROFR, Senator Breitbach, when asked for the bill
history, gave inaccurate responses and expressed ignorance about who backed
the ROFR. The video record of deliberations includes the three relevant
exchanges set forth below.

1. *Confusion over the origin of the bill.*

> SENATOR BISIGNANO: I'm going to Section 33, and that's the
> one on the electrical transmission lines, and I've never heard of
> anything like this in any moving legislation that was drafted and in
> committee, and do you have a bill history on the bill that this would
> have addressed?
>
> . . . .
>
> SENATOR BREITBACH: I do not have the bill number, but
> you'll remember it was the omnibus utility bill. We passed it in the
> -- in the Senate. We sent it over to the House. They took that portion

of -- There were 26 sections of that utility bill, and they took that part out of it, and -- and we're putting it in this bill.

2. *The sponsor misrepresents the legislative history.*

SENATOR BISIGNANO: Okay. So for -- That was two years ago. And then this year did it come out of the Senate or the House?

SENATOR BREITBACH: We've got it in front of us right now.

SENATOR BISIGNANO: It was never a bill. It was in the original two-year-ago bill; but when it got splintered out, it was basically dead. I mean, when you take something out, it's discarded. So it would have had to get its way back into this building by some interest. Who's the interest?

SENATOR BREITBACH: I'm not sure, because the utility bill that was running this year, I basically told the House, I said, I'm not going to pass a bill out of here and have you sit on it. If you want to get something done, you get it passed out of the House. *They worked on it over in the House, passed it out.*

SENATOR BISIGNANO: It failed in the subcommittee?

SENATOR BREITBACH: What's that? *It went through the full committee process, passed out of the House*, came over to the Senate. We did not move it.

SENATOR BISIGNANO: Okay. So this electric transmission line, there was a bill this year --

SENATOR BREITBACH: Yes.

SENATOR BISIGNANO: -- in the Senate that had passed the --

SENATOR BREITBACH: No. It was not in the Senate this year. It started in the House.

SENATOR BISIGNANO: This year.

SENATOR BREITBACH: Yes. We could ask Representative Carlson, who floor-managed it, exactly where it -- where it ended up at, but we've had a shortened session. We didn't get to finish the second funnel. It never made it here.

SENATOR BISIGNANO: So it didn't make the funnel, and no one lobbied for this. MidAmerican is not a supporter.[3] They're a large energy company. There's been no mention all year, until I read this tonight and was contacted and said, Where did this come from?

And we don't know where it came from. All we know is that two years ago it was in a utility bill. It got taken out. This year you're claiming the House, and I assume you're right, ran it through the process.

Was it vote -- or did they run out of time this year? Was it voted on the floor?

SENATOR BREITBACH: They ran out of time. I'm not sure if it was voted on the floor, but *it went through the committee process.* I had had several conversations with Representative Carlson. *I believe it made it all the way through the floor* because he was talking to me about it, trying to get it through legislation this year, but with the shortened session, this -- everything kind of blew up, you know.

SENATOR BISIGNANO: I'd like to wake up Representative Kaufman and ask him what the history of this was going through the House process because I think that's relevant. I mean, this is setting statute in business in the middle of the night that was never lobbied by any utility to have a chance to support or oppose it.

It's brand-new. The first time I saw it is an hour ago, maybe an hour and a half now, but I'm just uncomfortable with policy legislation coming through a budget bill in the middle of the night that no one's heard of, that I know of, and my utility is saying, what is this?

(Emphasis added.) In fact, the standalone ROFR had died in subcommittee in 2020 and never made it through the committee process or to the floor.

3. *Other misrepresentations by the sponsor.*

SENATOR BREITBACH: Okay. You know, there are several different ways you can -- you can do extension of utilities. One of the ways that has been used is if you own the line running to Area X and now you're going to go to Y, you're the company that gets to do it, period. Nobody else gets to bid on it. You have -- You have priority.

---

[3]Senator Bisignano's statement was correct when made, but later that night MidAmerican Energy Company registered in favor of the bill, as did ITC Midwest.

Another way to do it is to just put it out for open bids, take the low bid, that's it.

A couple problems with both of those ways. The first way, sometimes you don't get the best price. The second way, sometimes you have an out-of-area company come in and build it. They get paid, but they're not the one[] that's going to be there to maintain it and make sure that it's solid and continuing. So there's a trade-off there.

With this situation, it's a first right of refusal. So if I own the line going to Point X and they're bidding out to Y, *it's open for bids. If I happen to be the low bid, I get it. If somebody else happens to be the low bid and I have a first right of refusal, then I can say I will do it for that price* and I'll extend it out.

(Emphasis added.) In fact, the ROFR provides no competitive bidding or price-matching mechanism; to the contrary, the incumbent gets the project, period.

The bill containing the ROFR passed the senate at 5:47 a.m., four hours after the ROFR was introduced.[4] It passed the house that afternoon.[5]

Amici in this appeal previously had successfully lobbied to block the ROFR as a standalone measure in 2018 and early in the 2020 session. Those amici lacked time and notice to express their opposition to the ROFR this time around. For example, the Resale Power Group of Iowa (RPGI), a 28E entity representing twenty-four Iowa municipal utilities, seeks lower electric transmission costs

---

[4]*See* S. Journal, 88th G.A., 2d Sess., at 842–43 (Iowa 2020); *Senate Video HF 2643 - Continuing Approps*, Iowa Legislature, at 05:47:28–05:47:45 AM (June 14, 2020), https://www.legis.iowa.gov/dashboard?view=video&chamber=S&clip=s20200613085856120& dt=2020-06-14&offset=59814&bill=HF%202643&status=r.

[5]*See* H. Journal, 88th G.A., 2d Sess., at 774–75 (Iowa 2020); *House Video HF 2643 - Continuing Appropriations*, Iowa Legislature, at 01:07:08–01:08:20 PM (June 14, 2020), https://www.legis.iowa.gov/dashboard?view=video&chamber=H&clip=h20200614111809521& dt=2020-06-14.

through increased competition. RPGI observes that the circumstances of the ROFR's late-night enactment denied it "the opportunity to alert legislators to the anti-competitive structure and pricing consequences of the legislation."

**C. This Litigation.** On October 14, 2020, LSP filed this action against the IUB and several individual defendants in their official capacity: Geri D. Huser, IUB Chair; Glen Dickinson, Director of the Legislative Services Agency (LSA); and Leslie Hickey, Iowa Code Editor (collectively, "the State"). The Petition sought a declaratory judgment that the ROFR violated three provisions of the Iowa Constitution: (1) the single-subject clause, Iowa Const. art. III, § 29; (2) the title clause, *id.*; and (3) the privileges and immunities (equal protection) clause, *id.* art. I, § 6. LSP sought a temporary injunction prohibiting publication in the Iowa Code and enforcement of the ROFR pending resolution of this case. LSP alleged that MISO and SPP would pursue up to $30 billion in new electric transmission projects over the next ten years. LSP supported this claim with the observation that MISO and SPP were actively studying the viability of new projects throughout the region, including in Iowa, and were encouraged by the Midwestern Governors Association in 2020 to act with a sense of urgency.

The State resisted LSP's motion for temporary injunction, arguing LSP lacked standing and was unlikely to succeed on the merits of its constitutional challenge. The State filed a motion to dismiss, again arguing LSP lacked standing to challenge the constitutionality of the ROFR. MidAmerican Energy Company and ITC Midwest LLC were allowed to intervene, and both joined the State in its motion to dismiss and resistance to LSP's motion for temporary injunction. At a

combined hearing on the State's motion to dismiss and LSP's motion for temporary injunction, all parties argued standing and the merits of the constitutional issues. The parties argued only law; they did not dispute facts.

The district court concluded that LSP lacked standing because there was no indication that "a specific project is planned, when such a project may arise, or that [LSP has] been denied such a project." On that ground, the district court denied LSP's motion for temporary injunction and granted the State's motion to dismiss without reaching the merits of LSP's constitutional challenges. LSP moved for reconsideration, which the district court denied. LSP appealed; we transferred the case to the court of appeals.

Before the court of appeals heard oral argument, LSP filed another motion for a temporary injunction on May 27, 2022, to stay enforcement of the ROFR pending resolution of this appeal and any subsequent proceedings in district court. LSP asked the court of appeals to take judicial notice that MISO would approve over $1.5 billion in Iowa transmission projects on July 25. Neither the State nor the Intervenors disputed the accuracy of this fact but opposed taking judicial notice. On July 8, the court of appeals affirmed the district court's ruling dismissing the case on standing grounds. The court of appeals declined to take judicial notice of the newly pending transmission projects and denied injunctive relief. As planned, on July 25, MISO approved its "Tranche 1" package of eighteen new transmission projects in its Midwest Subregion. Press Release, MISO, *MISO Board Approves $10.3B in Transmission Projects* (July 25, 2022), https://www.misoenergy.org/about/media-center/miso-board-approves-

$10.3-in-transmission-projects/ [https://perma.cc/ZGT6-NPP2]. Three projects are to be in Iowa. *Id.* In the same announcement, MISO reiterated its plans for three additional tranches of transmission projects. *Id.*

We granted LSP's application for further review.

**II. Standard of Review.**

"We review a decision by the district court to dismiss a case based on the lack of standing for errors at law." *Dickey v. Iowa Ethics & Campaign Disclosure Bd.*, 943 N.W.2d 34, 37 (Iowa 2020) (quoting *Hawkeye Foodservice Distrib. Inc. v. Iowa Educators Corp.*, 812 N.W.2d 600, 604 (Iowa 2012)). In reviewing a motion to dismiss, we accept as true all well-pleaded facts in the petition. *Venckus v. City of Iowa City*, 930 N.W.2d 792, 798 (Iowa 2019).

We review rulings denying temporary injunctive relief for abuse of discretion. *League of United Latin Am. Citizens of Iowa v. Pate*, 950 N.W.2d 204, 214 (Iowa 2020) (per curiam); *Max 100 L.C. v. Iowa Realty Co.*, 621 N.W.2d 178, 180 (Iowa 2001) (en banc). Applying the wrong legal standard is an abuse of discretion. *NuStar Farms, LLC v. Zylstra*, 880 N.W.2d 478, 482 (Iowa 2016).

**III. Analysis.**

**A. Standing.** As we explain below, LSP's standing does not rise or fall on the issue of whether new transmission projects already have been approved. The district court and court of appeals erred by imposing that requirement.

Standing "must exist at the commencement of the litigation." *Klein v. Iowa Pub. Info. Bd.*, 968 N.W.2d 220, 234 n.9 (Iowa 2021) (quoting *Baker v. City of Iowa City*, 750 N.W.2d 93, 97 (Iowa 2008)). A party must satisfy two

requirements to demonstrate standing. "[A] complaining party must (1) have a specific personal or legal interest in the litigation and (2) be injuriously affected." *DuTrac Cmty. Credit Union v. Hefel*, 893 N.W.2d 282, 289 (Iowa 2017) (quoting *Horsfield Materials, Inc. v. City of Dyersville*, 834 N.W.2d 444, 452 (Iowa 2013)). On the first prong, "we require the litigant to allege some type of injury different from the population in general." *Id.* (quoting *Hawkeye Foodservice*, 812 N.W.2d at 606). On the second, a plaintiff must show an injury in fact that is fairly traceable to the defendant's conduct and is likely to be remedied by a favorable decision. *Iowa Citizens for Cmty. Improvement v. State*, 962 N.W.2d 780, 790 (Iowa 2021). "[T]he injury cannot be 'conjectural' or 'hypothetical,' but must be 'concrete' and 'actual or imminent.' " *DuTrac Cmty. Credit Union*, 893 N.W.2d at 289 (quoting *Hawkeye Foodservice*, 812 N.W.2d at 606). To demonstrate sufficient imminence, "[o]nly a likelihood or possibility of injury need be shown"; "[a] party need not demonstrate injury will accrue with certainty, or already has accrued." *Iowa Bankers Ass'n v. Iowa Credit Union Dep't*, 335 N.W.2d 439, 445 (Iowa 1983).

A business that is excluded from competing for new projects is injured upon its exclusion. *Horsfield Materials, Inc.*, 834 N.W.2d at 457. "An entity 'need not demonstrate that it has been, or will be, the low bidder on a Government contract. The injury in cases of this kind is that a 'discriminatory classification prevent[s] the plaintiff from competing on an equal footing.' " *Id.* at 458 (quoting *Adarand Constructors, Inc. v. Pena*, 515 U.S. 200, 211 (1995)). As we explained,

the injury in fact supporting standing arises when the government imposes the barrier that prevents the plaintiff from competing:

> When the government erects a barrier that makes it more difficult for members of one group to obtain a benefit than it is for members of another group, a member of the former group seeking to challenge the barrier need not allege that he would have obtained the benefit but for the barrier in order to establish standing. The "injury in fact" in an equal protection case of this variety is the denial of equal treatment resulting from the imposition of the barrier, not the ultimate inability to obtain the benefit.

*Id.* (quoting *Ne. Fla. Chapter of Associated Gen. Contractors of Am. v. City of Jacksonville*, 508 U.S. 656, 666–69 (1993) (holding subcontractor otherwise "able and ready to bid" had standing to challenge ordinance favoring minority-owned businesses)).

At oral argument, we asked counsel for the State about a hypothetical we modified from the one used to illustrate this point in *Horsfield Materials, Inc. v. City of Dyersville, see id.* at 457: What if the law favored white-owned transmission companies and excluded all minority-owned transmission companies? Counsel steadfastly maintained a specific project would have to arise before a minority-owned company would have standing to challenge the law. We disagree. For standing purposes, LSP was injured upon the ROFR's enactment; it does not have to identify a specific project it has already lost to the incumbent.

The State and the intervenors rely in part on *Iowa Citizens for Community Improvement v. State*, where we held social justice organizations lacked standing to sue over farm fertilizer runoff in the Raccoon River. 962 N.W.2d at 785, 794. They alleged their members paid higher water rates due to the costs of nitrate removal and that they suffered "aesthetic injury and injury to their recreational

use of the Raccoon River for swimming and kayaking." *Id.* at 787. We noted their asserted injuries arose "from the government's allegedly unlawful *failure* to regulate someone else." *Id.* at 791 (emphasis added). The principal relief they sought was an injunction compelling the enactment of unspecified legislation to improve water quality. *Id.* at 787. They alleged such legislation would lower their water bills and enhance their recreational enjoyment of the river. *Id.* We determined that their "attenuated causation theory" failed the redressability requirement. *Id.* at 785. By contrast, the State's ROFR enactment directly injured LSP as a specific bidder denied access to transmission projects, and redress is potentially available because Iowa courts may enjoin unconstitutional legislation.

Our standing jurisprudence is more permissive than federal law. *See Hawkeye Bancorporation v. Iowa Coll. Aid Comm'n,* 360 N.W.2d 798, 802 (Iowa 1985). This is no wonder: our rule is self-imposed, while the federal rule is a constitutional requirement. *Id.* But even under the more demanding federal standing jurisprudence, the United States Court of Appeals for the D.C. Circuit held that LSP had standing to challenge similar protectionist policies. In two cases decided the same day, the D.C. Circuit ruled LSP had standing to challenge two practices: (1) MISO's practice of awarding transmission projects to the transmission developer that owned the transmission infrastructure where the new project would be located, and (2) FERC's practice of excepting transmission projects from competitive bidding when it would delay the project and threaten electric grid reliability. *Coal. of MISO Transmission Customers v. FERC,* 45 F.4th

1004, 1008 (D.C. Cir. 2022); *LSP Transmission Holdings II, LLC v. FERC*, 28 F.4th 1285, 1287–89 (D.C. Cir. 2022). Such practices have the same effect as an ROFR in that they effectively preclude LSP from participating in a competitive bidding process. The D.C. Circuit held LSP had established an injury-in-fact because "(1) it 'was ready, willing and able to perform' the construction contracts for which it wished to compete, and (2) the challenged action 'deprived the company of the opportunity to compete for the work.'" *Coal. of MISO Transmission Customers*, 45 F.4th at 1015 (quoting *LSP Transmission Holdings II, LLC*, 28 F.4th at 1288–89). The same is true here.

Applying our test, on the first prong, the district court correctly concluded that LSP had a particularized injury distinct from the general population. *See Hawkeye Foodservice*, 812 N.W.2d at 606. The court of appeals recited, but did not review, this determination. We agree with the district court. Unlike members of the general public, LSP is approved to complete transmission projects in Iowa. Very few entities are so qualified. Yet section 478.16 injures LSP by precluding it from bidding on new projects in Iowa unless the incumbent fails to exercise its ROFR. *See id.*

On the second prong, the district court and court of appeals concluded that LSP failed to show an actual injury. We disagree. The new enactment effectively blocks LSP from competing. We have seen this before. In *Horsfield Materials*, we held a concrete supplier had standing based on the competitive disadvantage it incurred from being omitted from a list of concrete suppliers who were preapproved for city contracts. 834 N.W.2d at 457. The supplier

demonstrated its qualifications and competence to supply concrete for other projects. *Id.* It was unlikely—and far less likely than a preapproved supplier— that it would get work under a city contract due to its exclusion from the preapproved list and difficulties getting work after contracts had been awarded. *Id.* Thus, the supplier suffered a competitive injury without any showing of profits lost from its inability to take on a particular project. *Id.*

So it is with LSP. It has been left off a de facto preapproval list due to its lack of in-state transmission infrastructure. It is qualified and competent to supply transmission lines for in-state projects. Yet it is blocked from competing unless the incumbent declines to exercise its ROFR. Thus, LSP suffered a competitive injury without reference to any particular transmission project. That injury occurred at the time of the enactment of the ROFR and existed when LSP filed suit. *See id.*

It is plain to see that LSP's injury is traceable to the defendant State's actions and that a favorable decision will redress that injury. *See Iowa Citizens for Cmty. Improvement*, 962 N.W.2d at 790–91. Here again, this mirrors the effects of the city's preapproved bid list that caused an injury to the omitted party. *See Horsfield Materials, Inc.*, 834 N.W.2d at 457. A judgment in Horsfield's favor would have cut off the source of the injury and allowed it to return to the field of play. *Id.* at 457–58. The State's grant of an ROFR to the incumbent companies has caused LSP's harm; blocking the ROFR's enforcement would allow LSP to take the field.

LSP's injury in the form of lost future profits is also sufficiently imminent. LSP's petition alleged that MISO and SPP may approve some $30 billion in new electric transmission projects over the next ten years, some to be located in Iowa. LSP supported this allegation with the observation that MISO and SPP had begun studying ways to expand the transmission grid in the Midwest, including in Iowa. We take these factual allegations as true. Given that MISO and SPP will want a return on their investment of time and energy, it is likely these studies will translate into real-world transmission projects in Iowa within a few years. LSP's market value has presumably already declined from the loss of its ability to compete for new Iowa projects. LSP will lose profits when new projects go to the incumbent. This too suffices for standing. *See id.*; *Iowa Bankers Ass'n*, 335 N.W.2d at 445 ("A party need not demonstrate injury will accrue with certainty, or already has accrued.").

The district court and court of appeals erred by requiring a specific, live project to establish standing. We do not require evidence of existing harm. *See Horsfield*, 834 N.W.2d at 457 (rejecting the need for proof of lost profits associated with a particular project when a plaintiff can demonstrate a likelihood of exclusion from new projects); *Iowa Bankers Ass'n*, 335 N.W.2d at 444–45. Proof of a pending project would help establish standing, but it is not necessary. *See Iowa Bankers Ass'n*, 335 N.W.2d at 444–45. The court of appeals overemphasized the facts of those cases, each involving projects that had already been "barricaded away" from the plaintiffs or their competitors. An injury need be only "actual *or* imminent." *DuTrac Cmty. Credit Union*, 893 N.W.2d at 289

(emphasis added) (second quoting *Hawkeye Foodservice,* 812 N.W.2d at 606). It need not be both.

We find the federal authority persuasive. LSP is a Qualified Transmission Developer that is "ready, willing and able" to complete projects in Iowa. *See Coal. of MISO Transmission Customers*, 45 F.4th at 1015 (quoting *LSP Transmission Holdings II, LLC*, 28 F.4th at 1288–89). The ROFR, like the practices challenged in federal court, "deprive[s] [it] of the opportunity to compete for the work." *Id.* at 1015 n.3 (second alteration in original) (quoting *LSP Transmission Holdings II, LLC*, 28 F.4th at 1288–89). It is possible an incumbent transmission owner would decline to exercise its ROFR and thereby give LSP a chance to bid, but we find that scenario unlikely given the Intervenor incumbents' zealous efforts to defend the ROFR in court.

As amicus RPGI recognized:

> These electric transmission projects are being planned, queued for approval, and scheduled for development now. Waiting until transmission projects are already approved by MISO and development is already underway means it is too late for a non-incumbent transmission owner like LSP to get meaningful relief, which should necessarily come at the very outset of the MISO planning process, when new projects are in the very initial stages of proposal and years away from approvals, development, construction, and operation.

(Footnote omitted.) Another amicus, NextEra, identified the following new transmission projects in Iowa.

- A $755 million project in the Cedar Rapids area.

- A $231 million project spanning from Cedar Rapids to Atalissa, Iowa.

- A $390 million project spanning from Orient, Iowa into Missouri.

- A $673 million project spanning from Madison County, Iowa to Mount Pleasant.

- A $594 million project spanning from Mount Pleasant into Illinois.

We hold LSP met the standing requirements when it filed its petition. We do not reach LSP's request for judicial notice of the new project announcements, nor do we reach LSP's alternative request that we apply a "great public importance" exception to standing. *See Godfrey v. State*, 752 N.W.2d 413, 425 (Iowa 2008) (declining to apply that exception). We vacate the court of appeals decision and reverse the district court's dismissal ruling.

**B. Whether to Stay Enforcement of Section 478.16 Pending Resolution of the Constitutional Claims.** LSP and all amici argue we should issue a temporary injunction to stay enforcement of section 478.16 pending resolution of its constitutional claims on remand. The State and Intervenors oppose such an injunction. The district court previously denied a temporary injunction based on its erroneous conclusion that LSP lacked standing. Our holding that LSP has standing is now the law of the case. The district court has not yet ruled on other grounds for granting or denying a temporary injunction to stay enforcement of section 478.16. We have discretion to issue the temporary injunction now or remand to the district court to decide the injunction issue anew. *See* Iowa R. Civ. P. 1.1506 (permitting a district court judge or the supreme court or a justice thereof to grant a temporary injunction); *see also Berent v. City of Iowa City*, 738 N.W.2d 193, 206 & n.1 (Iowa 2007) (reversing district court

ripeness ruling and deciding issues that were briefed and argued on appeal instead of remanding for the district court to decide them).

The threshold requirement for a temporary injunction is a showing that LSP is likely to succeed on the merits in at least one of its constitutional challenges to the ROFR statute. *See Pate*, 950 N.W.2d at 208–09 ("A temporary injunction is available only if the party seeking the injunction can show a 'likelihood of success on the merits.' " (quoting *Max 100 L.C.*, 621 N.W.2d at 181)). We must decide whether to grant the stay or defer to the district court to decide anew whether to grant the temporary injunction on remand.

The appellate briefing squarely addressed the injunction issue. And LSP and Intervenor incumbent MidAmerican briefed the merits of the constitutional claims on appeal; the State and ITC Midwest chose not to brief the injunction issue on appeal but emphasized the urgency of resolving the legal issues in this case. All parties briefed the merits of the constitutional claims in district court. The constitutional claims turn on questions of law that do not require further development of an evidentiary record to evaluate LSP's likelihood of success on the merits on its constitutional claims under article III, section 29 of the Iowa Constitution. We review constitutional claims de novo. *Planned Parenthood of the Heartland, Inc. v. Reynolds ex rel. State*, 975 N.W.2d 710, 721 (Iowa 2022). We conclude the briefing and existing record are adequate to decide whether to issue a temporary injunction.

**C. LSP's Likelihood of Success on the Merits.** LSP challenges the constitutionality of the ROFR under article III, section 29 (title and single-subject

requirements) and article I, section 6 (equal protection) of the Iowa Constitution. Because we find its claims under article III, section 29 compelling, we begin there:

> Every act shall embrace but one subject, and matters properly connected therewith; which subject shall be expressed in the title. But if any subject shall be embraced in an act which shall not be expressed in the title, such act shall be void only as to so much thereof as shall not be expressed in the title.

Iowa Const. art. III, § 29. Challenges to legislation under this provision are justiciable and not merely aspirational. *Planned Parenthood of the Heartland, Inc.*, 975 N.W.2d at 728. But we will hold legislation unconstitutional only if it is palpably so. *See id.* at 724, 728. "[S]tatutes are cloaked with a presumption of constitutionality. The challenger bears a heavy burden, because it must prove the unconstitutionality beyond a reasonable doubt." *Id.* at 721 (quoting *Planned Parenthood of the Heartland, Inc. v. Reynolds*, 962 N.W.2d 37, 46 (Iowa 2021)). Out of over ninety attempts, we have held only thirteen statutes invalid under article III, section 29. *Id.* at 725 n.8. All thirteen violated the title requirement;[6]

---

[6]*See State v. Taylor*, 557 N.W.2d 523, 526–27 (Iowa 1996) (holding a title describing Code corrections did not give sufficient notice of substantive changes); *Giles v. State*, 511 N.W.2d 622, 625 (Iowa 1994) (same); *W. Int'l Ins. v. Kirkpatrick*, 396 N.W.2d 359, 365–66 (Iowa 1986) (en banc) (same); *State v. Nickelson*, 169 N.W.2d 832, 837 (Iowa 1969) (holding the title to the bill enacting the Uniform Commercial Code gave no notice of a criminal provision against embezzlement of mortgaged property); *Nat'l Benefit Acc. Ass'n v. Murphy*, 269 N.W. 15, 19 (Iowa 1936) (holding the title to a bill providing for the reincorporation of assessment life associations did not give fair notice of a provision prohibiting some companies from writing life insurance policies); *Smith v. Thompson*, 258 N.W. 190, 194 (Iowa 1934) (holding unconstitutional a provision reducing the salary of the members of the general assembly and lieutenant governor when the title referenced salary reductions for other officials but not these), *overruled on other grounds by Carlton v. Grimes*, 23 N.W.2d 883, 903–04 (Iowa 1946); *Chi., R.I. & P. Ry. v. Streepy*, 224 N.W. 41, 44 (Iowa 1929) (holding unconstitutional a provision conferring upon municipalities the power to tax to create an emergency fund when the title of the act referenced only the creation of a state budget office); *In re Breen*, 222 N.W. 426, 428 (Iowa 1928) (holding a provision suspending the license of any physician or pharmacist who was convicted for a federal narcotics offense was inadequately described by a title relating to the sale and transportation of liquor); *State v. Manhattan Oil Co.*, 203 N.W. 301, 303 (Iowa 1925) (holding unconstitutional a tax raising revenue

three also violated the single-subject requirement.[7]

Because LSP filed this action before section 478.16 was codified, its challenge under article III, section 29 may proceed. *See Tabor v. State*, 519 N.W.2d 378, 380 (Iowa 1994) ("The State's suggestion that codification of legislation otherwise invalid under article III, section 29 cures any continuing constitutional infirmity is not legally sound. The codification process only cuts off a right of constitutional challenge under article III, section 29 if no one has lodged such a challenge before codification is complete." (citing *State v. Mabry*, 460 N.W.2d 472, 474–75 (Iowa 1990) (establishing codification as the cutoff for constitutional challenges))).

1. *Title.* The title of an act must express the subject matter of the act. *See* Iowa Const. art. III, § 29. The title requirement is meant to provide "reasonable notice to lawmakers and the public regarding proposed legislation, thereby

---

to maintain highways when the title suggested the act contained merely regulatory provisions); *Des Moines Nat. Bank v. Fairweather*, 181 N.W. 459, 461–62 (Iowa 1921) (holding unconstitutional a provision prescribing "the method of fixing the assessed valuation of corporate stock in banks and trust companies" when the title of the bill purported only to amend a list of tax-exempt property); *State v. Bristow*, 109 N.W. 199, 200 (Iowa 1906) (holding unconstitutional a statutory definition of "peddler" that expanded the term to include "itinerant vendor" when only "peddler" appeared in the title); *Rex Lumber Co. v. Reed*, 77 N.W. 572, 573–74 (Iowa 1898) (holding unconstitutional a provision granting public officers additional means to collect taxes when the title related only to "the lien of taxes between vendor and vendee"); *Williamson v. City of Keokuk*, 44 Iowa 88, 92 (1876) (holding unconstitutional a section that attempted to "legalize and make valid certain acts of the [Keokuk] city council" when the title referred only to amending the charter of the city of Keokuk).

[7]*See Taylor*, 557 N.W.2d at 526 (holding a provision criminalizing trafficking in stolen weapons violated single-subject requirement when all but six sections of the seventy-four-section bill related to juvenile justice); *Giles*, 511 N.W.2d at 625 (holding a substantive change incorporated into a Code correction bill violated single-subject requirement); *W. Int'l Ins.*, 396 N.W.2d at 364–65 (same).

preventing surprise and fraud." *Giles v. State*, 511 N.W.2d 622, 625 (Iowa 1994). The legislature need not turn the title into an index, but it may use a title that is "plain and broad, and direct[s] the attention to the general subject." *Iowa Sav. & Loan Ass'n v. Selby*, 82 N.W. 968, 969 (Iowa 1900). "In examining the sufficiency of an act's title, we likewise favor a finding of constitutionality." *State v. Iowa Dist. Ct.*, 410 N.W.2d 684, 686 (Iowa 1987). "A title is sufficient, even though it is broad, if it gives fair notice of a provision in the body of an act." *Id.* (quoting *W. Int'l v. Kirkpatrick*, 396 N.W.2d 359, 365 (Iowa 1986) (en banc)). Accordingly, legislation will be "constitutionally valid as to the title unless matter utterly incongruous to the general subject of the statute is buried in the act." *Id.*

The title of H.F. 2643 is "An Act relating to state and local finances by making appropriations, providing for legal and regulatory responsibilities, providing for other properly related matters, and including effective date and retroactive applicability provisions." 2020 Iowa Acts ch. 1121. At the end of the act was a new law that insulated in-state electric transmission entities from out-of-state competition through the ROFR. *Id.* § 128. No part of the title gives notice of that provision.

Intervenor MidAmerican Energy argues the title "legal and regulatory responsibilities" provided fair notice of the ROFR. It relies on the unpublished court of appeals opinion *Rush v. Reynolds*, No. 19–1109, 2020 WL 825953, at *13 n.21 (Iowa Ct. App. Feb. 19, 2020), in which the court of appeals approved that phrase in a title as a constitutionally adequate catchall for the disparate subjects. No decision of our court has so held. Approving a bare allusion to "legal

and regulatory responsibilities" would allow boilerplate recitations to satisfy article III, section 29. Textually, the constitution's phrase "shall be expressed" in the title would cease to do any work. Iowa Const. art. III, § 29; *see Express*, *Black's Law Dictionary* (11th ed. 2019) ("Clearly and unmistakably communicated; stated with directness and clarity."). If that phrase passes constitutional muster, the legislature could use it on every bill it enacts.

In our view, this title is so amorphous that it is difficult to discern the shape and contours of the subject of the bill to which the ROFR might be "utterly incongruous." *See Iowa Dist. Ct.*, 410 N.W.2d at 686. And it is difficult to identify the "general subject" to determine whether the title adequately directs attention to the ROFR provision. *See Iowa Sav. & Loan Ass'n*, 82 N.W. at 968–69. The title probably fails to "clearly and unmistakably communicate[]" the subject matter of H.F. 2643, and it likely fails to provide fair notice of the ROFR. *See Giles*, 511 N.W.2d at 625.

H.F. 2643 likely was enacted with a title that does not comply with article III, section 29. We conclude that LSP is likely to succeed on the merits on its "title" challenge to Iowa Code section 478.16.

2. *Single subject.* Intertwined with the title requirement is the single-subject requirement: each act must embrace only a single subject. Iowa Const. art. III, § 29. "In determining whether the single subject requirement has been complied with, we construe the enactment liberally in favor of its constitutionality." *Planned Parenthood of the Heartland, Inc.*, 975 N.W.2d at 721 (quoting *Iowa Dist. Ct.*, 410 N.W.2d at 686).

The single-subject requirement primarily prevents logrolling. *See id.* at 727.

> Logrolling occurs when a provision unrelated to the core of a bill and not itself capable of obtaining majority support is tied to a popular bill having majority support. Logrolling also occurs when several matters, none of which individually has majority support, are joined in one bill and passage procured by combining the minority in favor of each into a majority willing to enact them all.

*Id.* (quoting *Iowa Dist. Ct.*, 410 N.W.2d at 686). To pass constitutional muster, "all matters treated [in an act] should fall under some one general idea and be so connected with or related to each other, either logically or in popular understanding, as to be part of . . . one general subject." *Giles*, 511 N.W.2d at 625 (alteration and omission in original) (quoting *Long v. Bd. of Supervisors*, 142 N.W.2d 378, 381 (Iowa 1966)). The proper analysis is to "search for (or to eliminate the presence of) a single purpose toward which the several dissimilar parts of the bill relate." *Mabry*, 460 N.W.2d at 474 (quoting *Miller v. Bair*, 444 N.W.2d 487, 490 (Iowa 1989)).

We begin our single-subject analysis by looking at the enactment itself. *See Planned Parenthood of the Heartland, Inc.*, 975 N.W.2d at 721. We are skeptical that any single subject could encompass the breathtaking sweep of matters included in H.F. 2643. The title itself gives us pause on single-subject grounds: "An Act relating to state and local finances by making appropriations, providing for legal and regulatory responsibilities, providing for other properly related matters, and including effective date and retroactive applicability provisions."

LSP argues the subjects are so unrelated the only way to fit them within a single, common subject is to assert they are all "laws." It observes the bill contained a medley of appropriations provisions, *e.g.*, 2020 Iowa Acts ch. 1121, § 4, corrective provisions, *e.g.*, *id.* § 64 (codified at Iowa Code § 260C.48 (2021)), and grants of substantive rights, such as the ROFR, *id.* § 128 (codified at Iowa Code § 478.16 (2021)). We have repeatedly held that combining substantive provisions with corrective provisions in one bill is fatal under article III, section 29. *See Giles*, 511 N.W.2d at 625 (holding a substantive change incorporated into a Code correction bill violated single-subject requirement); *W. Int'l Ins.*, 396 N.W.2d at 364–65 (same). We have that combination here—with appropriations added to the mix.

Other courts have rejected legislation cobbled together from such disparate subjects. The Illinois Supreme Court rejected as too vague the proffered subjects "governmental matters" and "governmental regulation." *People v. Olender*, 854 N.E.2d 593, 603 (Ill. 2005); *People v. Reedy*, 708 N.E.2d 1114, 1119 (Ill. 1999). H.F. 2643 similarly combines numerous disparate subjects.

Although not "directly relevant," we have also considered the legislative history of the bill and "the circumstances of [its] passage." *Planned Parenthood of the Heartland, Inc.*, 975 N.W.2d at 727. The ROFR failed to garner sufficient votes for enactment as a standalone bill in 2018 and again in 2020. The unpopularity of the ROFR is clear: it had already failed earlier in the same session and in the previous general assembly. The affidavits of legislators from

both parties confirm the ROFR lacked the votes to become law as a standalone bill. The appropriations bill, necessary to fund the operations of the government, presented a ready vehicle to carry the ROFR across the finish line. Rolling it all into one bill brought legislative success, but triggered LSP's constitutional challenge. Attaching an unpopular matter to a bill that is sure to pass is a hallmark of logrolling. *Planned Parenthood of the Heartland, Inc.*, 975 N.W.2d at 727 (quoting *Mabry*, 460 N.W.2d at 473).

Just last term, we rejected a logrolling claim. *See id.* at 727. There, the challenged legislation, establishing a 24-hour waiting period for abortions, had been "separately approved by a house majority." *Id.* Both houses had debated the 24-hour waiting period at length, and it was clear the contents and effects of the bill were known to all legislators. *Id.* Both sections of the final bill "pertained to the identified subject of 'medical procedures,' specifically government regulation of medical procedures in the interest of preserving human life." *Id.* at 726. Importantly, "[n]o legislator who voted for HF 594 contends they would have voted against the 24-hour waiting period as a standalone provision." *Id.* at 727. And "[n]o legislator contends they did not understand the contents of HF 594 or were misled as to what they were voting on." *Id.*

Such is not the case with the ROFR. The senate held debate on the ROFR immediately before it did the same with the 24-hour waiting period. Unlike the 24-hour waiting period, however, the ROFR is not germane to the numerous unrelated subjects in the appropriations bill. And the amorphous subject of the bill, "state and local government and regulatory matters—appropriations and

miscellaneous changes," is much less precise and considerably less concrete than "medical procedures." Importantly, legislators were unsure of what they were voting on. Senators had not seen the ROFR until 1:33 a.m. on the final day of the legislative session. After the ROFR was introduced, the senate caucused for approximately one hour, and then debate began. The ROFR's sponsor could not produce a bill history, nor could he accurately describe the ROFR's demise in the house earlier in the term. *Senate Video HF 2643: S-5163 by Breitbach of Clayton*, Iowa Legislature, at 4:12:32–4:21:12 AM (June 14, 2020), https://www.legis.iowa.gov/dashboard?view=video&chamber=S&clip=s202006 13085856120&dt=2020-06-14&offset=59814&bill=HF%202643&status=r. Most conspicuously, the ROFR had not been approved even by a house subcommittee earlier in the same term. The bill sponsor falsely represented the provision as allowing competitive bidding and price-matching. It is undisputed the ROFR lacked the votes to pass as a standalone measure. LSP argues the passage of the ROFR presents a textbook example of logrolling and violates the single-subject requirement.

We are not surprised the ROFR lacked enough votes to pass without logrolling. The provision is quintessentially crony capitalism. This rent-seeking, protectionist legislation is anticompetitive. Common sense tells us that competitive bidding will lower the cost of upgrading Iowa's electric grid and that eliminating competition will enable the incumbent to command higher prices for both construction and maintenance. Ultimately, the ROFR will impose higher costs on Iowans. The data back this up: amicus Coalition of MISO Transmission

Customers offers data collected from two recent bid-based projects that indicate competition reduces costs by fifteen percent compared to MISO's estimates. As the Coalition summarizes, "Without competition, there are fewer checks and balances on cost estimates, and no pressures or incentives to curb project costs and prevent cost overruns."

We conclude that LSP has shown a likelihood of success on the merits of its claim that the ROFR's enactment violates the single-subject requirement of article III, section 29 of the Iowa Constitution.

3. *Equal protection.* LSP also argues the ROFR violates the guarantee of equal protection under the Iowa Constitution:

> All laws of a general nature shall have a uniform operation; the general assembly shall not grant to any citizen, or class of citizens, privileges or immunities, which, upon the same terms shall not equally belong to all citizens.

Iowa Const. art. I, § 6. Having concluded LSP has shown a likelihood of success on its challenges under article III, section 29, we need not address its equal protection claim.

**D. Other Factors Justifying a Stay.**

1. *Irreparable harm to LSP.* Iowa Rule of Civil Procedure 1.1502(1) permits a temporary injunction to prevent irreparable harm to the movant. LSP faces irreparable harm through the loss of opportunity to land multi-million-dollar electric transmission projects in Iowa. "These sorts of injuries, i.e., deprivations of temporally isolated opportunities, are exactly what preliminary injunctions are intended to relieve." *Bao Xiong ex rel. D.M. v. Minn. State High Sch. League*, 917 F.3d 994, 1003 (8th Cir. 2019). If these multi-million-dollar transmission

projects go to the incumbents and we ultimately hold section 478.16 is unconstitutional, then LSP will be irreparably harmed by having lost out on a unique opportunity to do business in Iowa. Neither the State nor the intervenors argue LSP has an adequate remedy at law through a cause of action for money damages on projects where it was wrongfully prevented from bidding.

We have long recognized that we may enjoin "an unconstitutional statute or ordinance to prevent irreparable injury to the business and property of the plaintiff." *Stoner McCray Sys. v. City of Des Moines*, 78 N.W.2d 843, 850–51 (Iowa 1956). Federal courts have held that the "irreparable harm" requirement is met when the movant shows it is likely to succeed in showing a constitutional violation. *Am. C.L. Union of Ky. v. McCreary County*, 354 F.3d 438, 445 (6th Cir. 2003), *aff'd sub nom. McCreary County v. Am. C.L. Union of Ky.*, 545 U.S. 844 (2005). We reach the same conclusion here.

2. *Balancing the harm to the parties.* We "balance the harm that a temporary injunction may prevent against the harm that may result from its issuance." *Max 100 L.C.*, 621 N.W.2d at 181 (quoting *Kleman v. Charles City Police Dep't*, 373 N.W.2d 90, 96 (Iowa 1985)). As we explained above in our standing analysis, LSP is harmed by the loss of opportunity to compete for new projects. The intervenors who are shielded from competition by the challenged statute have consistently argued new projects are years away. If so, they face no harm from competition while this case is pending. And they have no right to protection from an unconstitutional statute. The State would be harmed "by not being allowed to enforce its duly enacted law." *Law v. Gast*, ___ F. Supp. 3d ___,

___, 2022 WL17337609, at *4 (S.D. Iowa Nov. 30, 2020). But that interest does not apply if "the law in question is unconstitutional." *Id.* Based on our assessment that LSP is likely to succeed on its constitutional challenge, the balance of harms favors a temporary stay.

3. *The public interest.* The public has an interest in reliable electric service at reasonable rates. The intervenors argue their rates are regulated. But LSP and the amici persuasively argue the challenged ROFR will decrease competition and thereby increase the cost of electricity for Iowans. As NextEra aptly observes, "It is axiomatic that competition breeds innovation, variety, higher quality goods and services, and lower prices for consumers." In urging our court to enjoin enforcement of section 478.16, NextEra notes:

> [The ROFR] deprives the Iowa market of the benefits of competition by eliminating the opportunity entirely. By granting an exclusive right to incumbent electric transmission owners to construct, own, and maintain electric transmission lines, desirable competitors are permanently deprived of the chance to propose, bid on, and ultimately construct, own, and operate critically important transmission line projects in the State of Iowa. . . . [T]he preclusion of this competition . . . will undoubtedly injure Iowa residents by removing [the incumbent's] incentives to innovate, improve, and reduce costs.

Similarly, the MISO transmission customers, large commercial end users of electricity in the Midwest, conclude that section 478.16's ROFR "prevent[s] the efficiency and price-lowering benefits of competition for transmission projects." This amicus elaborates, "With the ROFR, an incumbent utility in Iowa has little or no incentive to minimize costs because such costs are passed directly through rates to captive customers without viable alternatives for transmission services." And RPGI raises the same alarm, stating the ROFR "will almost certainly increase

the cost of electricity to customers across the State, including rate payers in RPGI communities."

The amici also warn that higher electric rates will discourage businesses and industry from locating or expanding in Iowa. RPGI states, "Retail electric rates are a major factor in a community's efforts to attract and keep businesses and residents." RPGI explains,

> RPGI member communities are harmed by businesses and industrial electric users opting not to locate or expand in their communities. Instead, these organizations choose locations outside of ITC-MW's footprint to avoid higher electricity costs due to the exorbitant transmission rates of ITC-MW. This lack of economic development, in turn, creates an endless cyclical cost creep issue for ratepayers. It is challenging for RPGI members to grow their electric service rate base because ITC-MW's rates are so much higher than other transmission providers elsewhere in Iowa.

It is not our role to second guess policy choices of the elected branches or regulators. But it is our role to adjudicate whether constitutional lines were crossed in the enactment of H.F. 2643. At this stage of the litigation, we are persuaded that LSP is entitled to a temporary injunction that stays enforcement of the ROFR statute pending final resolution of its constitutional claims.

**IV. Disposition.**

For the foregoing reasons, we vacate the judgment of the court of appeals and reverse the judgment of the district court. We remand the case for the district court to finally decide the merits of LSP's constitutional claims. We grant LSP's application for a temporary injunction staying enforcement of section 478.16 pending resolution of this case. No bond shall be required. This stay applies only

to Division XXXIII, section 128 of H.F. 2643 and does not reach any other provisions enacted in H.F. 2643. *See* Iowa Code § 4.12 (establishing severability).

**TEMPORARY INJUNCTION GRANTED. DECISION OF COURT OF APPEALS VACATED; DISTRICT COURT JUDGMENT REVERSED AND CASE REMANDED WITH INSTRUCTIONS.**

All justices concur except Oxley, McDermott, and May, JJ., who take no part.